**UNITED STATES of America, Appellee,**

v.

**Luis BUENO–RISQUET, Marta Pinto-Rodriguez, Maria Torres, Esteban Zarate, Juan Jose Quinones and Carmen Pinto, Defendants-Appellants.**

Nos. 713–718, Docket 85–1346 to
85–1350 and 85–1352.

United States Court of Appeals,
Second Circuit.

Argued Jan. 21, 1986.

Decided Aug. 7, 1986.

Stephen F. Markstein, Asst. U.S. Atty., New York City (Rudolph W. Giuliani, U.S. Atty., S.D.N.Y., Stuart E. Abrams, Asst. U.S. Atty., New York City, of counsel), for appellee.

Lorin Duckman, New York City for defendant-appellant Luis Bueno-Risquet.

Bobbi C. Sternheim, New York City, for defendant-appellant Marta Pinto-Rodriguez.

Lawrence Farkash, New York City (Patricia M. Karish, New York City, of counsel), for defendant-appellant Maria Torres.

Henry J. Steinglass, New York City for defendant-appellant Esteban Zarate.

Laurence A. Urgenson, New York City (Anderson, Laino & Urgenson, P.C. New York City, of counsel), for defendant-appellant Juan Jose Quinones.

Michelle Weston Patterson, Brooklyn, for defendant-appellant Carmen Pinto.

Before LUMBARD, MESKILL, and PIERCE, Circuit Judges.

LUMBARD, Circuit Judge:

Luis Bueno-Risquet, Juan Quinones, Marta Pinto-Rodriguez, Maria Torres, Esteban Zarate, and Carmen Pinto appeal from judgments of conviction entered against them on September 9, 1985, after a six-week jury trial in the Southern District before Chief Judge Motley.[1]

The superseding indictment on which they were tried charged nineteen defendants in twenty-three counts with various federal narcotics violations, including conspiracy to distribute heroin and cocaine in New York and New Jersey between January 1, 1980 and February 26, 1985.[2] Thirteen defendants went to trial.[3] One defendant, Anthony Torres, was acquitted. At the close of the government's case, Chief Judge Motley dismissed the case against Jose De Jesus and Anderson Delgado, both of whom were charged solely in the conspiracy count. The firearms counts against Quinones were also dismissed for lack of sufficient evidence. Convictions were returned against all other defendants whose cases were submitted to the jury.[4]

We consider the following points raised by appellants: (1) appellants claim that they were denied their Sixth Amendment right to confront their accusers and their right to cross-examine witnesses because certain bags of heroin, which were marked for identification and which allegedly contained skull and crossbones markings, were unavailable because they had been stolen by Assistant United States Attorney Daniel Perlmutter; and that (2) Perlmutter's actions should be considered willful suppression of evidence by the government for which sanctions should be imposed; (3) Quinones claims that Chief Judge Motley's charge on the criminal enterprise count was improper because it included anticipated profits within the definition of substantial income; (4) Pinto claims that under *United States v. Geaney*, 417 F.2d 1116 (2d Cir.1969), *cert. denied*, 397 U.S. 1028, 90

---

**1.** The appeal of Luis Quinones was withdrawn. The four other defendants who were tried and convicted, did not appeal.

**2.** The original indictment, returned September 5, 1984, charged appellant Juan Quinones and five others with narcotics and firearms law violations relating only to events which took place in the Bronx and Manhattan in August 1984. The superseding indictment, however, included the defendants' earlier New Jersey activities in the conspiracy and criminal enterprise counts.

**3.** Eddie Quinones pled guilty to the conspiracy count and testified pursuant to a cooperation agreement at trial. He received a five-year suspended sentence and five years' probation. Jose Luis Pimentel pled guilty to the conspiracy count and to distributing heroin. He was sentenced as a young adult offender to concurrent three-year terms of probation. Four defend-

ants, Elmer Franky Sanchez, Jr., Alfonso Hernandez, Nancy Valentine, and Carlos Campos-Perez were fugitives.

**4.** Appellant Quinones received three concurrent ten-year sentences for conspiracy to distribute heroin and cocaine, for engaging in a continuing criminal enterprise, and for distributing cocaine; a five-year sentence for distributing heroin, to be followed by a five-year special parole term; and a four-year sentence for using a telephone in various narcotics transactions. All sentences were ordered to run concurrently. Appellant Zarate received a four-year sentence on the conspiracy count. Defendant Pinto received a suspended eighteen-month sentence, also on the conspiracy count, and three years' probation. Defendants Pinto-Rodriguez and Torres each received suspended sentences of two years on the conspiracy count to be followed by three years' probation.

S.Ct. 1276, 25 L.Ed.2d 539 (1970) co-conspirator statements were not admissible against her; and that there was insufficient evidence to convict her of the conspiracy charge; (5) Zarate claims the evidence related to two separate conspiracies, that he was involved in only one, and that he was prejudiced by trial on both conspiracies; (6) Zarate further claims that it was error not to grant his severance motion; and (7) Zarate claims that certain evidence about firearms and racial rivalaries should have been excluded under Fed.R.Evid. 403.

We find no error, and, accordingly affirm the convictions.

### EVIDENCE AT TRIAL

The evidence adduced at the six-week trial may be summarized as follows. In 1981, Quinones recruited Bueno-Risquet and Zarate, both Mariel boat-lift refugees from Cuba living in New Jersey, and began a large-scale drug operation that distributed cocaine and heroin from Mexico to California, Pennsylvania, New York, and New Jersey. The testimony of undercover agents who infiltrated the drug ring, as well as the testimony of cooperating witnesses Eddie Quinones, appellant's brother who kept track of the organization's money, Daniel Sardina, and Alberto Salas, friends and accomplices of the ring leaders, reveals that from 1981 to 1984 the three principals, their family members and others bought and sold drugs out of their Camden, New Jersey storefronts and homes. Quinones was responsible for procuring the drugs, while Bueno-Risquet managed street sales and distribution. Zarate held money for the partnership and used his home for cutting and storing heroin.

In April and May of 1984, the New Jersey State Police made numerous undercover purchases of heroin and cocaine from Bueno-Risquet, Pinto-Rodriquez, Torres and Carlos Campos-Perez resulting in their arrests. Bueno-Risquet and Quinones, who had been arrested in New Jersey earlier on other drug charges, jumped bail and moved their center of operation to the Bronx, New York.

On August 11, 1984, Drug Enforcement Administration ("DEA") Special Agent de la Cova, who was stationed in New York, received a heroin sample from a confidential informant, who had purchased it from an associate of Quinones. Thereafter, de la Cova negotiated with Quinones for the purchase of larger quantities of drugs. A deal was worked out whereby Quinones would provide Agent de la Cova with ten ounces [5] of heroin for $62,500. Quinones told Agent de la Cova that he had an immediate need for cocaine and the two discussed the possibility of exchanging heroin for cocaine. Agent de la Cova told Quinones he would go to Florida to check on the availability of cocaine but that he would need two ounces of heroin to show the people in Florida before he would agree to purchase more heroin. On August 21, 1984, Quinones supervised the sale to Agent de la Cova of two ounces of heroin for $12,500 in the neighborhood of 11th Avenue and 54th Street, Manhattan. Agent de la Cova again told Quinones that if de la Cova's confederates in Florida approved of the heroin, he would come back to buy more and would also make arrangements to sell Quinones cocaine.

Over the next few days, de la Cova telephoned Quinones, pretending to be in Florida, and said that he would bring back thirty-five kilos of cocaine to sell to Quinones. On August 26, de la Cova called Quinones and told him that he had the thirty-five kilos of cocaine and that he had $500,000 to purchase two kilos of heroin. The next day, Agent de la Cova told Quinones that he would need $50,000 before delivering the cocaine. Quinones, however, suggested exchanging the equivalent of $50,000, or six ounces of heroin, for the cocaine and Agent de la Cova agreed. The two went to Quinones' apartment, at 1052 Hall Place in the Bronx, where Quinones

---

**5.** The ounces were so-called "Mexican ounces," a term for all amounts equaling ¼ kilogram of heroin.

gave de la Cova six ounces of heroin agreed to be worth $50,000 and, later that same day, another nine ounces toward a one kilogram purchase request by de la Cova.

In the evening of August 27, Quinones and others met with Agent de la Cova at a gas station, at 149th Street and Southern Boulevard, to pick up the thirty-five kilos of cocaine Agent de la Cova was to deliver. At that time, DEA Agents arrested Quinones, Bueno-Risquet, Jose Luis Pimentel, Tomas Sanchez, and Anthony Torres. Shortly thereafter, other agents executed a search warrant for Quinones' apartment where they arrested Eddie Quinones. Marta Pinto-Rodriguez and Carmen Pinto were present, but were not arrested at the time. Jose Vazquez escaped by jumping out a window, but was arrested later. The search of the premises yielded a small quantity of heroin and two handguns.

None of the defendants took the stand at trial and only Zarate, Pinto and Torres called witnesses who testified about peripheral matters.[6]

### I. *The Missing Bags of Heroin*

The appellants ask for reversal of their convictions because the theft of certain of the government's exhibits during trial allegedly deprived them of a fair trial by making it impossible for them to confront certain government witnesses with the exhibits. The particular exhibits, which had been marked for identification, consisted of bundles of glassine bags each containing heroin. They had been purchased by two New Jersey State police detectives who testified at trial that all the bags were marked

with skull and crossbones. However, the appellants claim that according to notes made by one of defense counsel, who had examined the exhibits prior to their theft, some of the bags may not have contained the skull and crossbones marking.[7] The claim on appeal is that by confronting the government witnesses with the alleged discrepancy, doubt would have been cast on their testimony.

We are not persuaded that there is any cause for complaint in the rulings of the district court which followed the discovery that the exhibits had been destroyed, including the ruling admitting police records to support the testimony of the government's witnesses with respect to the skull and crossbones markings. A summary of the sequence of events at trial will show how trivial the markings were in light of the overwhelming and uncontradicted evidence of the defendants' activities.

The four government exhibits in question were marked for identification as: GX–31, GX–32, GX–33 and GX–35. The exhibits consisted of the following:

31, two bundles of heroin (50 bags) purchased by New Jersey State Police Detective Warren Mabey on April 25, 1984 at Torres' home in Camden from Bueno-Risquet and Campos-Perez with Torres acting as interpreter.

32, two bundles of heroin (50 bags) purchased by Detective Mabey on April 26, 1984 from the same three defendants at the Torres' house.

33, one bundle of heroin (25 bags) purchased by Detective Mabey and Robert

---

6. Zarate called two witnesses. William Fuller testified, contrary to Salas' testimony, that there was no safe in Zarate's basement floor nor any evidence of a safe ever having been there. Photos of the floor were admitted into evidence. Zarate's second witness, Theodore Freeman, a building inspector, testified that he examined the floor with Fuller and saw no evidence of a safe or any recent construction.

   Pinto called Stuart Chertoff, a professional photographer, who testified that he could not see into Pinto's house from the outside, on the day he took the photos. This testimony was offered to contradict Salas' testimony that he

had observed Pinto take heroin from her sofa and give it to Bueno-Risquet. Photos of the layout of Pinto's apartment were admitted into evidence.

   Torres introduced a stipulation that there was no evidence of any relationship between herself and Anthony Torres, and which contained her children's birthdates.

7. Counsel brought his notes to the court's attention during a side-bar conference outside the presence of the jury. Counsel also included copies of the notes in Torres' post-trial motion for acquittal.

Rice on May 8, 1984, at the Torres' house from Campos-Perez.

35, one bundle of heroin (25 bags) purchased by Detective Rice on May 17, 1984, from Bueno-Risquet at the Torres' house.

On Thursday, May 23, ten days after trial began, the exhibits were unsealed in the courtroom after the jury had left for the day for counsel to view.

On Sunday, May 26, one of the prosecutors found that these exhibits, along with weapons, cash, and narcotics from this and other cases were missing from the safe.[8]

On Tuesday, May 28, when the trial reconvened the government informed the court and counsel that the exhibits were missing. Nothing was said to the jury at that time, and the trial proceeded.

On Thursday, May 30, United States Attorney Giuliani reported to Chief Judge Motley and defense counsel, outside the jury's presence, that Assistant United States Attorney Daniel Perlmutter, who did not participate in the trial although he had handled the case from its inception through the indictment stage, had been arrested on May 29th and charged with the theft of the drugs marked in this case and also a quantity of drugs from another case then on trial. Giuliani also told the court that the drugs had apparently been destroyed and would not be available at trial. Also that same day, Chief Judge Motley informed the jury that Perlmutter had been charged with the theft of these drugs.[9] The judge told the jurors that they would hear testimony about the missing evidence but that it was no longer available. At the end of

the day, Chief Judge Motley cautioned the members of the jury not to speculate about why Perlmutter had been removed from this case even though they were certain to hear of his arrest.

The exhibits were never received in evidence because they were stolen before foundation testimony for their admission had been given. Nevertheless, after the loss of the exhibits the government produced the testimony of the New Jersey detectives who purchased the bags of heroin and the chemists who examined the bags and verified their contents.

Detective Mabey testified that immediately after he made the heroin purchases on April 25 and 26 he brought the bundles to the State Police chemist and filled out a "Request For Analysis Form" for a test of the contents. Detective Rice testified that he too immediately brought the bags purchased on May 8 and 17 to the chemist's office and filled out a Request Form. Each of the Request Forms indicated that the glassine bags of heroin contained in GX–31, 32, 33 and 35 bore skull and crossbones markings.

The jury also heard testimony of three forensic chemists of the New Jersey State Police, Edward LaRue, Mark Maxwell and Harry Corey, who analyzed the contents of the bags left at the laboratory by Detectives Mabey and Rice.

Harry Corey testified that he received four specimens for analysis from Detective Mabey on April 26, 1984. Specimen one consisted of three glassine bags which Corey determined contained cocaine. Specimen two contained one bag of cocaine.

---

8. Other evidence discovered missing from this case, but not specifically concerning the skull and crossbones markings, included: GX–43, 321 bags of heroin thrown from Zarate's van by Bueno-Risquet and Campos-Perez and recovered by the New Jersey police; GX–42, cocaine recovered at the time of Bueno-Risquet's arrest in Camden, New Jersey on June 6, 1984; two exhibits not marked for identification, consisting of a gram of cocaine each and which were recovered from Sardina when he was arrested in 1983; and GX–36, a piece of yellow paper containing a phone number allegedly written by Maria Torres. Torres objected to the introduc-

tion of a copy of the note at trial. We have not addressed this point on appeal because the copy is plainly admissible under Fed.R.Evid. 1004.

9. Perlmutter's name had been mentioned during the trial because he was the Assistant originally assigned to this case. He interviewed Eddie Quinones prior to his agreement to cooperate with the government. After an unexplained absence from the U.S. Attorney's Office, from November 1984 until January 1985, a number of Perlmutter's cases had been reassigned to other Assistants in the early months of 1985.

Specimens numbers three and four each contained twenty-five glassine bags of brownish powder and each of these bags was marked with a skull and crossbones. From his tests Corey concluded the powder in both specimens was heroin. He identified the Request Form for these drugs, GX–31A, filled out by Detective Mabey.

Corey also testified about an additional two specimens he had received from Detective Mabey, on April 27, 1984, each containing twenty-five glassine bags of a brownish-white powder. Corey testified that each of these bags was also marked with a skull and crossbones. After testing, Corey found these specimens to be heroin. He identified GX–32A, the Request Form for these drugs, filled out by Detective Mabey.

Edward LaRue stated that he had analyzed a specimen containing twenty-five glassine bags of brown and white powder given to him by Detective Rice on May 9, 1984 and found it to contain heroin; and that each glassine bag was marked with a skull and crossbones. He also identified the Request for Analysis Form, GX–33A, which Detective Rice had filled out and sent to the laboratory. On cross-examination LaRue stated that he saw that the Request Form indicated the presence of the skull and crossbones markings and he later examined each individual bag and found each one to contain a skull and crossbones mark.

Mark Maxwell testified that on May 21, 1984, Detective Rice gave him a specimen composed of twenty-five glassine bags containing a brown and white powder for analysis. Maxwell said that he believed all of the bags contained a purple skull and crossbones marking. After testing a portion of the specimen, Maxwell concluded the bags contained heroin. He identified the Request Form GX–35A filled out by Detective Rice and submitted with the glassine bags.

All three chemists testified that they had no independent recollection of the skull and crossbones markings; they all used the Request Forms to refresh their recollections. At the time they received the bags, however, they examined each bag to be sure it matched the description on the Request Form.

During the testimony of the three chemists, the court admitted in evidence, over objection, the four Request Forms, GX–31A, 32A, 33A and 35A. Counsel for Torres based his objection on notes he had made on May 23, when these exhibits had been temporarily unsealed in the courtroom. The notes indicated that the bags which Mabey testified he had purchased on April 26, 1984, did not contain skull and crossbones markings.[10] Counsel made the objection outside the presence of the jury, and because counsel declined to take the stand or otherwise make the credibility of his notes an issue, no evidence on this matter was presented to the jury. Counsel did, however, include his notes as an exhibit in Torres' post-trial motion (joined in by Pinto-Rodriguez, Zarate and Bueno-Risquet) for a judgment of acquittal pursuant to Fed.R.Crim.P. 29(c), which motion Chief Judge Motley denied.

Appellants claimed in their post-trial motion and now claim on appeal that their Sixth Amendment and due process rights were violated by the introduction into evidence of the Request Forms and the testimony of the detectives and chemists in lieu of the actual physical evidence of the drugs. Appellants further argue that the government has willfully suppressed the evidence in this case and ask that the sanction of reversal be imposed. We disagree.

A. *Sixth Amendment Claim*

The claim on appeal—that the court should have excluded the testimony of the purchasing officers and the chemists because the bags of heroin no longer existed—was not made at trial. There was no objection to this testimony. The only objec-

---

**10.** Torres' counsel's notes, however, did indicate the presence of the skull and crossbones markings on the other specimens about which Corey had testified and which had been purchased by Detective Mabey on April 25.

tion made at trial was to the admission of the four Request Forms.

■ Because there was a good reason why the bags could not be produced, it was proper for the Court to receive the testimony of the detectives and the chemists, and to leave to the jury the assessment of that evidence. Having received the testimony of the detectives and the chemists about the bags and their markings, it was within the discretion of the court to admit evidence of the Request Forms which the witnesses had used to refresh their recollection. *See* Fed.R.Evid. 803(5). Moreover, the Request Forms themselves were properly admitted as secondary evidence under Fed.R.Evid. 1004(1), as we hold that there is no indication that the Government lost or destroyed the original evidence in bad faith. *See United States v. Cambindo Valencia,* 609 F.2d 603, 633 (2d Cir.1979), *cert. denied,* 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 795 (1980). In the absence of the bags, the Request Forms were the best documentary evidence of the bags' markings at the time the bags were deposited in the office of the chemists for the purpose of testing their contents.

Appellants' counsel also argue that because they were unable to prove the chemists and police officers wrong concerning the skull and crossbones markings on at least some of the missing exhibits, their ability to impeach the witnesses was so severely damaged that they were denied any effective cross-examination whatsoever.

■ Although it is true that the defendants could no longer confront the government's witnesses with the bags which they alleged did not bear the skull and crossbones trademark testified to by the government witnesses, the defendants did have full opportunity to cross-examine the detectives and the chemists and they did so. There was no evidence contradicting any of the testimony of the government's witnesses regarding the purchase of the bags and their contents and their markings. There was an abundance of evidence from which the jury could conclude, if they credited the

evidence, that the New Jersey detectives had purchased heroin from certain defendants. Thus, we conclude that under all the circumstances there was no deprivation of any Sixth Amendment right of confrontation.

B. *Due Process Claim*

The appellants argue that their right to due process was violated by the admission of evidence about the bags of heroin because the government was responsible for the disappearance of the bags which had been marked for identification. They cite *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) in support of their claim. We disagree.

There is nothing in the record which would indicate that Perlmutter's actions were in any way sanctioned or encouraged by the government. Nor is there any evidence that the Assistants handling the case, or Perlmutter himself, desired to deprive the defendants of a fair trial. The district court record in the Perlmutter case, 85 Cr. 942 (CES) (S.D.N.Y.), of which we take judicial notice, reveals that Perlmutter pleaded guilty to five counts of possessing narcotics and theft of drugs and money belonging to the government. Perlmutter apparently stole the drugs for his own use. He received a three-year sentence of imprisonment to be followed by five years probation.

■ It is obvious that the theft of the exhibits could hardly have been for the purpose of harming the defense. By no stretch of the imagination can it be supposed that the defense could have been strengthened by the production of the bags of heroin. Sanctions are unwarranted where, as here, the government cannot fairly be blamed for the loss of the evidence and the evidence, at any rate, would not have helped the defense. *See United States v. Grammatikos,* 633 F.2d 1013, 1019–22 (2d Cir.1980).

Accordingly, we find no denial of appellants' due process rights and no basis for imposing any sanctions by reason of the

theft of the drugs by an assistant prosecutor.

## II. *Continuing Criminal Enterprise Charge*

Although Quinones did not take exception at trial, he now objects to that part of Judge Motley's charge on the continuing criminal enterprise count concerning the element of substantial income. The continuing criminal enterprise statute, 21 U.S.C. § 848, was enacted to provide harsher penalties for large scale dealings in drugs from which substantial income is obtained. The statute requires proof that the plaintiff *actually received* substantial sums of money from a series of drug transactions. The defense was concerned that the jury might have convicted Quinones based on his *anticipated* income from the resale of the 35 kilograms of cocaine which he had arranged to buy from Agent de la Cova. Specifically, Quinones objects to the court's language regarding anticipated profits:

> Income in this context is considered to mean gross income or profit, and includes anticipated profits as well as those actually realized.[11]

This portion of the jury charge was erroneous. Although it is well settled that anticipated income may serve as circumstantial evidence of income actually gained by a defendant, *see United States v. Chagra,* 669 F.2d 241, 257 (5th Cir.), *cert. denied,* 459 U.S. 846, 103 S.Ct. 102, 74 L.Ed.2d 92 (1982); *see also United States*

*v. Ayala,* 769 F.2d 98, 102 (2d Cir.1985), the plain language of the statute indicates that the element to be proved is income actually obtained. The court's charge indicated that the jury need not find any income actually obtained if it found instead that income was anticipated.

██ Since the claim of error is one of constitutional magnitude, the question becomes whether the error was harmless beyond a reasonable doubt, or, as we recently stated it, "whether there exists a reasonable possibility that the error may have contributed to [the defendant's] conviction." *Hawkins v. LeFevre,* 758 F.2d 866, 877 (2d Cir.1985). Given the mass of evidence about Quinones' long term successes in the drug business, we conclude that there was no reasonable possibility that the jury based its finding of the substantial income element on the profits anticipated from the government sting operation. Not only was there evidence of many thousands of dollars in cash being moved around at Quinones' behest, there was also evidence of money being given to him for drugs and testimony that he told a government agent that he had made a lot of money in narcotics which he had invested in various ways. Thus, taking the jury charge as a whole and considering the amount of evidence presented on this element of the crime, we hold that the court's error was harmless beyond a reasonable doubt. *See Hawkins v. LeFevre,* 758 F.2d at 877–78.

---

11. The entire charge on the continuing enterprise reads as follows:

Finally in connection with charges in Counts II and III, the fifth and final essential element is proof beyond a reasonable doubt the defendant obtained substantial income or resources from the continuing series of violations of the federal drug laws which is charged against him.

As used here, "substantial" means something that is real and actual, and has considerable or ample size or value. There is no particular minimum dollar figure which the government must prove to establish this element of the crime, so long as you find that the income derived from the defendant's illegal activities in narcotics was substantial.

Income can be simply defined as money or other material resources received or gained by

the defendant from the conspiracy to distribute or possess with intent to distribute heroin or cocaine.

Income in this context is considered to mean gross income or profit, and includes anticipated profits as well as those actually realized.

In brief, in order to convict under this count, you must find that the government has established beyond a reasonable doubt that Juan Jose Quinones in the case of Count II ... received what any reasonable person would consider to be considerable funds from his activities in violation of the drug laws.

You may not convict on this count if you determine that the defendant received merely occasional, small or trivial sums of money or resources from such activities.

## III. Admissibility of Co-Conspirator Statements and Sufficiency of Evidence Against Pinto

Carmen Pinto makes two arguments: (1) that there was insufficient non-hearsay evidence of her involvement in the conspiracy to permit the introduction of co-conspirators' statements against her. *United States v. Geaney*, 417 F.2d 1116 (2d Cir. 1969), *cert. denied*, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970) and; (2) that there was insufficient evidence to convict her of the conspiracy.

■ The hearsay evidence against Pinto was properly admitted as there was ample independent evidence of her membership in the conspiracy. Eddie Quinones testified that he observed Pinto and Pinto-Rodriguez take money from the Camden drug sales to Quinones in the Bronx. He further testified that he observed Juan Quinones give Pinto $3,000 for safekeeping after discussing the fact that the money came from drug deals. Sardina observed Pinto's son take money from drug sales made at "The Point" in Camden to Pinto's house and then return to The Point with additional heroin. Salas testified that he had seen Pinto take drugs she had stored under her sofa and give them to Bueno-Risquet. Additionally, Salas testified that he had seen Pinto give Pinto-Rodriguez heroin outside Pinto's house where "everyone could see it," and that he had seen Pinto helping Pinto-Rodriguez sell drugs at The Point.

## IV. Zarate's Arguments

Zarate claims (1) that the evidence established two conspiracies rather than the single conspiracy charged and that he was therefore prejudiced by "spillover" from the other conspiracy, *see Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946); (2) that it was error not to grant his severance motion; and (3) that evidence of his involvement in racial rivalries and with the use of firearms was so prejudicial that it should have been excluded under Fed.R.Evid. 403.

■ From the evidence we have summarized above it is apparent that the jury could find the New Jersey and New York operations were one conspiracy run by the same people. *United States v. Alessi*, 638 F.2d 466, 472 (2d Cir.1980); *United States v. Potamitis*, 739 F.2d 784, 787 (2d Cir.), *cert. denied*, 469 U.S. 934, 105 S.Ct. 332, 83 L.Ed.2d 269 *and* 469 U.S. 918, 105 S.Ct. 297, 83 L.Ed.2d 232 (1984). It is well established that one conspiracy does not necessarily end and a new one begin whenever there is a change in personnel, location, or a lapse of time in the conspiracy's operation. *United States v. Vila*, 599 F.2d 21, 24 (2d Cir.), *cert. denied*, 444 U.S. 837, 100 S.Ct. 73, 62 L.Ed.2d 48 (1979). In any event, in this case the evidence showed a significant overlap in personnel between the Camden, New Jersey and Bronx, New York locations; there was evidence that the heroin sold from both places was Mexican brown heroin; the selling methods used by the group were the same at both locations; and the lapse in time between the New Jersey and New York operations was minimal. There was sufficient evidence for the jury to find that there was one conspiracy. Moreover, Judge Motley properly instructed the jury on multiple conspiracies; thus, the issue was properly left to the jury's determination. *United States v. Tramunti*, 513 F.2d 1087, 1107–08 (2d Cir.), *cert. denied*, 423 U.S. 832, 96 S.Ct. 55, 46 L.Ed.2d 50 (1975).

■ Zarate failed to make any showing that he was prejudiced by the denial of his severance motion. In light of the ample evidence implicating Zarate in the conspiracy, there was no reason to grant his severance motion.

■ Zarate now complains about the admission of allegedly inflammatory testimony that his bodyguard was armed when arrested outside Zarate's house and testimony that Salas fired a machine gun at Zarate's house on Zarate's birthday. By failing to object at trial to the machine gun evidence and by failing to suggest to the trial judge that evidence concerning the bodyguard was unduly prejudicial, Zarate's

**814**

complaint comes too late. In any event, the evidence was properly admitted.

 The probative value of the testimony that Bueno-Risquet obtained weapons from Zarate's house in order to chase away a rival group of black drug dealers outweighs any prejudicial impact. As the government suggests, "the evidence did not concern racial rivalries; it concerned business." The district court acted within its discretion under Fed.R.Evid. 403 in admitting the evidence.

The other claims of error do not merit discussion.

Convictions affirmed.