UNITED STATES of America

v.

**Bryan McKIE, Appellant.**

No. 91–3014.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 15, 1991.

Decided Dec. 6, 1991.

Alan P. Bayles (appointed by the court), with whom Mary E. Davis was on the brief, for appellant.

Elizabeth H. Danello, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John R. Fisher, Thomas C. Black, and Carol A. Fortine, Asst. U.S. Attys., were on the brief, for appellee.

Before RUTH BADER GINSBURG and SILBERMAN, Circuit Judges, and VAN GRAAFEILAND,* Senior Circuit Judge, United States Court of Appeals for the Second Circuit.

Opinion for the Court filed PER CURIAM.

PER CURIAM:

Appellant Bryan McKie was convicted of simple possession of more than five grams of a mixture containing cocaine base (crack). *See* 21 U.S.C. § 844(a). He appeals his conviction on two grounds, arguing that the drug evidence on which his conviction was based was the fruit of an unconstitutional *Terry* stop and that the district court erred in not ordering a mistrial or the exclusion of secondary evidence when the drug evidence was lost. We reject both arguments and affirm the conviction.

I.

On July 18, 1990, Detective Gary O'Neal of the Washington, D.C. police received a tip from an informant of unchallenged reliability. O'Neal was told that a crack dealer the informant had discussed before was again "working" in a store parking lot in northeast Washington. The informant described the *modus operandi* that the dealer had used on prior occasions: the dealer would sell crack and then return to his car, where he would place his remaining drug supply on the floormat and drive away, returning later. And the informant precisely described the dealer's clothing, the dealer's car (including its license plate number), and the location of the car in the parking lot.

O'Neal and two other police officers, James Chris Minar and William Davis, immediately drove to the scene in an unmarked car. When they arrived, O'Neal spotted the dealer's car and shortly thereafter observed the alleged dealer, Ronald Clipper, standing near the middle of the parking lot and talking with the appellant, Bryan McKie (who was previously unknown to O'Neal). Clipper and McKie then walked to Clipper's car, got in, and drove away. The police followed. Investigator Minar saw Clipper, who was driving, look back towards the officers' car and "seem[ ] to [speed] the car up some." Then, without any prompting from the police, Clipper stopped his car and McKie exited from the passenger side and began walking towards the rear of the car with his hands in his pockets. While O'Neal and Davis stopped Clipper, Minar drew his gun, identified himself as a police officer, approached McKie, stopped him, and placed him spread-eagle against the back of the car. At this point, Minar noticed a napkin sticking out of the left front pocket of McKie's shorts; looking closer, Minar saw a plastic bag inside the napkin; leaning over to look even closer, he saw an off-white object in the bag. Believing the substance to be crack, Minar seized it, and, after the substance field-tested positive for cocaine, placed McKie under arrest.

McKie was indicted for possession with intent to distribute over five grams of cocaine base. *See* 21 U.S.C. § 841(a), (b)(1)(B)(iii). The district court denied McKie's pre-trial motion to suppress the drug evidence, finding that the evidence

---

* Sitting by designation pursuant to Title 28 U.S.C. § 294(d).

stemmed from "a permissible *Terry* stop" that "then evolved permissibly into a plain view situation." The case proceeded to a bench trial. Just before the government called a Drug Enforcement Administration (DEA) chemist to testify as to the authenticity and weight of the crack, the prosecutor admitted to the district judge that the physical evidence—the crack and its packaging—had "disappeared" somewhere between the DEA laboratory and the court property room. After being assured that efforts to locate the evidence had "been made all morning," the judge denied McKie's motion for a mistrial and allowed the DEA chemist to testify. The chemist, relying on his lab report rather than his own recollection, testified that the substance seized from McKie was 13.01 grams of 79% cocaine base.

At the end of the government's case-in-chief, McKie moved for a directed verdict of acquittal, relying on the lost evidence. The prosecutor now explained that the evidence had been signed out at the DEA lab but still could not be found in the property room. Her theory was that the evidence was "in that property room somewhere" and would "show up" if the government "continu[ed] a diligent search." Finding no bad faith on the part of the government, the court denied McKie's motion.

The district judge found McKie not guilty of possession with intent to distribute but guilty of the lesser included offense of simple possession. Because McKie possessed more than five grams of cocaine base, he faced a mandatory minimum sentence of 60 months; due to prior convictions, he was sentenced to 86 months.

## II.

We first consider McKie's claim that he was seized unconstitutionally and that the evidence taken from his pocket—even if in plain view once he was stopped and spread-eagled against Clipper's car[1]—was therefore inadmissible. *See Horton v. Califor-*

nia, 496 U.S. 128, 110 S.Ct. 2301, 2308, 110 L.Ed.2d 112 (1990); *Texas v. Brown,* 460 U.S. 730, 738 & n. 4, 103 S.Ct. 1535, 1541 & n. 4, 75 L.Ed.2d 502 (1983) (plurality opinion). Under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), a police officer may stop and briefly detain a person for investigatory purposes if the officer has a *reasonable suspicion,* based on "specific and articulable facts"—rather than on an "inchoate and unparticularized suspicion or 'hunch'"—that the person is involved in criminal activity. *Id.* at 21, 27, 88 S.Ct. at 1879, 1883; *see United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989). The criminal activity for which the police can temporarily detain suspects includes "illegal transactions in drugs." *Florida v. Royer,* 460 U.S. 491, 499, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983) (plurality opinion). In determining whether a *Terry* stop was reasonable, we look at the totality of the circumstances, *see Sokolow,* 490 U.S. at 8, 109 S.Ct. at 1585, and we review the district court's determination *de novo, see United States v. Maragh,* 894 F.2d 415, 417–18 (D.C.Cir.), *cert. denied,* — U.S. ——, 111 S.Ct. 214, 112 L.Ed.2d 174 (1990).

■ McKie acknowledges that the police undoubtedly had reason to stop Clipper. *See Alabama v. White,* — U.S. ——, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301 (1990) (informant's tip can provide reasonable suspicion). It is argued, however, that the police did not have reasonable suspicion that McKie himself was involved in criminal activity and that they stopped him only because he was with Clipper. *See Ybarra v. Illinois,* 444 U.S. 85, 91, 100 S.Ct. 338, 342, 62 L.Ed.2d 238 (1979) (holding that "a person's mere propinquity to others independently suspected of criminal activity does not" by itself constitute probable cause to search or reasonable suspicion to frisk). McKie urges us not to adopt an "automatic companion" rule allowing police who are arresting a suspect to stop and frisk the suspect's companions. *See, e.g.,*

---

**1.** McKie does not challenge the district court's finding that the evidence was in plain view after   the stop.

*United States v. Berryhill*, 445 F.2d 1189, 1193 (9th Cir.1971) ("All companions of the arrestee within the immediate vicinity, capable of accomplishing a harmful assault on the officer, are constitutionally subjected to [a frisk]."). *But see, e.g., United States v. Flett*, 806 F.2d 823, 827 (8th Cir. 1986) (rejecting rule and requiring case-by-case analysis of particular circumstances).

This is not, however, a "mere propinquity" case and we need not take a position on the "automatic companion" rule to decide it. The stop of McKie was not automatic—justified solely by the stop of Clipper—but rather had an independent foundation. McKie was observed walking with and talking to a suspected drug dealer *at the very time and in the very place of the suspected drug dealing. Cf. Sibron v. New York*, 392 U.S. 40, 62, 88 S.Ct. 1889, 1902, 20 L.Ed.2d 917 (1968) (defendant's talking with "known narcotics addicts over a period of eight hours" did not establish reasonable suspicion when there was no indication of ongoing narcotics transactions). The government is not, therefore, asking that we allow the police to use suspected criminals as "roving warrants" justifying *Terry* stops of all their companions. *Cf. United States v. Hill*, 730 F.2d 1163, 1167 (8th Cir.) (police cannot move an arrestee around to bring distant items within the Fourth Amendment's search incident to arrest exception), *cert. denied*, 469 U.S. 884, 105 S.Ct. 255, 83 L.Ed.2d 192 (1984). Here the police received a precise and reliable tip; when they arrived at the parking lot they reasonably believed that Clipper was selling crack *there and then*. Detective O'Neal observed McKie walking and talking with Clipper, behavior consistent with an impending or just-completed drug transaction. Those actions, to be sure, might also have been entirely innocent, but even normally innocent acts can in some circumstances, like these, support reasonable suspicion. *See Sokolow*, 490 U.S. at 9–10, 109 S.Ct. at 1586–87. We think, therefore, that even at that stage there may well have been reasonable suspicion to justify a stop of McKie to investigate whether he was involved in Clipper's drug operation.

But there was more. Detective O'Neal saw McKie and Clipper get in Clipper's car together and drive away. This certainly indicated that McKie's relationship with Clipper was more than simply incidental and transient, since "one would expect that persons in a ... car are there by invitation or consent" and are not mere strangers. *United States v. Vaughan*, 718 F.2d 332, 335 n. 6 (9th Cir.1983). The informant, moreover, had told O'Neal that Clipper stored his drug supply in that very car. Thus, under the circumstances, once Clipper and McKie entered the car, we believe the police had adequate reason to stop the car and to detain and question McKie briefly. (That Clipper preempted them by stopping the car without prompting does not affect our analysis.)

McKie contends in passing that even if facts supporting the *Terry* stop are discernible in the record, the police did not adequately articulate those facts when testifying at the suppression hearing. We recognize that Investigator Minar's explanation of the reasons supporting the stop was quite summary: "I was going to detain [McKie] until Detective O'Neal could put the pieces of the investigation together.... I was just following directions from Detective O'Neal." But *Terry* requires only that the facts establishing reasonable suspicion be "articulable"—as opposed to "inchoate"—not that the officer making the stop precisely and individually articulate the facts that added up to suspicion in his mind. The *Terry* standard being one of objective reasonableness, we are not limited to what the stopping officer says or to evidence of his subjective rationale; rather, we look to the record as a whole to determine what facts were known to the officer and then consider whether a reasonable officer in those circumstances would have been suspicious. *See United States v. Bonner*, 874 F.2d 822, 829 (D.C.Cir.1989). We believe that the record here establishes that Investigator Minar acted reasonably in stopping McKie.

Because the *Terry* stop was lawful and McKie concedes that it evolved into a plain view situation, evidence regarding the

crack cocaine seized from McKie was properly admissible at trial.

## III.

■ The physical evidence—the crack itself—was, however, lost by the government and therefore never actually admitted at McKie's trial. The government instead relied on a DEA lab report to establish that the substance seized was 13.01 grams of 79% cocaine base. McKie argues that he should have been granted a mistrial after the crack was lost, or, alternately, that secondary evidence (the lab report and the DEA chemist's testimony) regarding the crack should have been excluded. He relies primarily on our missing evidence decision in *United States v. Bryant,* 439 F.2d 642 (D.C.Cir.1971). *Bryant* put a "heavy" burden on the government to show that it had established and followed "rigorous and systematic" procedures to preserve *"all* discoverable evidence" and required the district court to "weigh the degree of negligence or bad faith involved, the importance of the evidence lost, and the evidence of guilt adduced at trial in order to come to a determination [of sanctions] that will serve the ends of justice." *Id.* at 651–53 (emphasis in original).

Whatever the continuing vitality of *Bryant* in its original context regarding claims under the Jencks Act, *see United States v. Lam Kwong–Wah,* 924 F.2d 298, 310 (D.C.Cir.1991), it is clear that due process claims, such as the one McKie raises here, are now governed by the standards enunciated in *Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). In *Youngblood,* the Court held that to establish a due process violation, the *defendant* bears the burden of proving that the government failed *in bad faith* to preserve *material* and *potentially exculpatory* evidence. *See id.* at 58, 109 S.Ct. at 337; *see also California v. Trombetta,* 467 U.S. 479, 488–89, 104 S.Ct. 2528, 2533–34,

81 L.Ed.2d 413 (1984); *United States v. Bueno–Risquet,* 799 F.2d 804, 811 (2d Cir. 1986) (relied on by the district court). Here, the district court specifically found no bad faith on the part of the government, and there is nothing in the record to refute that finding; we certainly cannot say that the district court's decision regarding the quintessentially factual question of intent was clearly erroneous. *See United States v. Galvan–Garcia,* 872 F.2d 638, 641 (5th Cir.), *cert. denied,* 493 U.S. 857, 110 S.Ct. 164, 107 L.Ed.2d 122 (1989).

There is nothing in the record, moreover, to indicate that the lost evidence was potentially exculpatory rather than inculpatory. McKie himself testified at trial that he possessed crack (disputing only his knowledge of the amount), so he cannot tenably argue now that his conviction for possession of crack was illegitimate.[2] The drug evidence could conceivably have been exculpatory if its weight were actually less than the five grams required for a five-year mandatory minimum sentence under 21 U.S.C. § 844(a). However, we note—without implying that all of these factors are necessary to our decision—that the drugs were apparently available before trial for McKie's independent testing; that the government established a chain of custody from the crime scene to the DEA laboratory test; and that the chemist who performed the test was available for cross-examination and the laboratory equipment used for the test presumably available for examination, *see Trombetta,* 467 U.S. at 489–90, 104 S.Ct. at 2534–35. In short, while the lost evidence was clearly material, we do not believe that it was likely to be exculpatory or that its loss prejudiced McKie in any substantial way. *See id.* at 489, 104 S.Ct. at 2534 (no due process violation when "chances are extremely low that preserved [evidence] would have been exculpatory"); *see also United States v. Webster,* 750 F.2d 307, 333–34 (5th Cir.1984)

---

2. Indeed, most of defense counsel's argument at trial regarding the missing evidence concerned not the authenticity of the drugs but their packaging. Defense counsel apparently hoped to compare the packaging to that seized from Clipper during a subsequent arrest to further the defense theory that Clipper and not McKie was the drug distributor. The district court, however, refused to allow McKie to put on evidence of Clipper's later arrest and, in any event, found McKie guilty only of possession, not of possession with intent to distribute.

(allowing statutory sentence enhancement when the record revealed a "low probability that, had the marijuana been preserved, appellants would have been able to establish that it weighed less than one thousand pounds" and finding only one published opinion denying an enhancement because of missing evidence), *cert. denied,* 471 U.S. 1106, 105 S.Ct. 2340, 85 L.Ed.2d 855 (1985).

We are, nevertheless, somewhat uncomfortable with the rather cursory treatment of the missing evidence problem by the government and the district court. The district court based its finding of no bad faith on quite meager assurances from the prosecutor, who herself seemed relatively unconcerned about the loss. The court might well have granted a short continuance to allow the government and the defendant to investigate and respond to the loss. Still, there was at least a lunch break during which the prosecutor apparently conducted some investigation and defense counsel some research, and in light of all the circumstances, we cannot conclude that the district court abused its discretion to control the proceedings before it.

\*　　\*　　\*　　\*　　\*　　\*

For the reasons stated above, we affirm the judgment of the district court.

*So ordered.*