KELSEY, J.,
dissenting.
The case is important not because I think it is a good or bad policy to stop vehicles for what some consider to be an insignificant vehicular safety violation, but because I disagree with the majority’s factual narrative and believe that much of the majority’s legal analysis is out of sync with settled precedent.
I.
I will restate the facts as I believe we must — “in the light most favorable to the Commonwealth, giving it the benefit of any reasonable inferences.” Glenn v. Commonwealth, 49 Va.App. 413, 416, 642 S.E.2d 282, 283 (2007) (en banc) (internal quotation marks omitted), aff'd, 275 Va. 123, 654 S.E.2d 910 (2008).
A police officer testified that, while operating stationary radar, he saw “a vehicle that came by with a dangling object.” App. at 21. The object was dangling from the rearview mirror. Id. at 22. At the suppression hearing, the officer identified the object that he observed. It was an opaque parking pass, measuring five inches long and three inches wide. The parking pass was introduced as an exhibit at the suppression hearing. The officer testified that he “saw it clearly ” as the vehicle “went by” him. Id. at 31 (emphasis added). Two questions later, when asked if the dangling parking pass that he so clearly observed “could obstruct a driver’s view,” the officer said unequivocally, “It could, yes, ma’am.” Id. (emphasis added).
At the suppression hearing, the trial judge made various remarks from the bench suggesting his inclination to grant the motion to suppress. After making these remarks, however, the judge requested briefing and “asked for additional time to consider” the issue. Id. at 101. The trial judge also later *607 examined the parking pass and took a “view of the scene,” id., to determine if the parking pass could obstruct a driver’s vision in a vehicle similar to the one that the officer had stopped. See Oral Argument Audio at 9:47 to 9:55, 26:04 to 26:30 (stipulation of counsel). The parking pass, reproduced in its actual size, looks like this:
[[Image here]]
Later, on the day of trial, the judge advised counsel that he had reconsidered his earlier remarks during the suppression *608 hearing. He said that his initial “concern” was that the parking pass did not “substantially obstruct” the driver’s view of the highway. App. at 102 (emphasis added). But after reviewing the caselaw “stacked up against me,” the judge explained, he realized that neither the statute nor the reasonable suspicion standard required a substantial obstruction. Id. at 105. He noted that one of the cases making this point was an unpublished opinion from our Court, Commonwealth v. Bryant, No. 0076-04-1, 2004 WL 1313044, at *1, 2004 Va.App. Lexis 283, at *4 (Va.Ct.App. June 15, 2004) (Humphreys, J.).
In Bryant, we reversed a trial court for granting a suppression motion in a similar context. There, an officer stopped a vehicle after observing an “air freshener hanging from the rear view mirror” that the officer believed “could” have partially obstructed the driver’s view. Id. (internal quotation marks omitted). Considerably smaller than the opaque parking pass in our case, the air freshener in Bryant was “in the shape of a dragon” and was “three-and-a-half by one-and-a-half inches.” Id. at *2, 2004 Va.App. Lexis 283 at *5 (internal quotation marks omitted). Under these facts, we held that the trial court plainly erred by concluding that these facts did not give rise to a reasonable suspicion that the vehicle could have been in violation of Code § 46.2-1054. Id. at *5, 2004 Va.App. Lexis 283 at *15-16; see also Richardson v. Commonwealth, No. 0946-13-3, 2014 WL 1041799, at *1, 2014 Va.App. Lexis 98, at *4 (Va.Ct.App. March 18, 2014) (Huff, J.) (upholding a traffic stop where the officer observed that an “air freshener could be in violation of Virginia’s ‘obstruction of view’ statute”).
The trial judge also relied upon Pegram v. Commonwealth, No. 1041-95-2, 1996 WL 537862, at *1, 1996 Va.App. Lexis 611, at *4 (Va.Ct.App. Sept. 24, 1996) (Willis, J.), in which we similarly noted that an officer had “stopped the vehicle based upon his belief that it was being operated in violation of Code § 46.2-1054.” The object in that case was a “large cloth object” hanging from the mirror. Id. at *1, 1996 Va.App. Lexis 611 at *2. We held that even though the officer was unable “to describe the cloth,” that “d[id] not invalidate the *609 stop.” Id. at *1, 1996 Va.App. Lexis 611 at *4. To the contrary, “[bjecause [the officer] had probable cause to believe that the cloth object violated Code § 46.2-1054, the trial judge did not err in finding that the [officer] had authority to stop the vehicle and to issue a summons.” Id.
Acknowledging that he “initially disagreed” with the view taken by these cases, the trial judge explained that “what carrie[d] the day” was the “definition” of obstruction. App. at 105. “[U]ltimately it’s the definition that persuaded the Court that that’s what the law is intended and that’s what the law says.” Id. at 105. Repudiating his earlier views, the trial judge held:
[T]he Court is of the opinion that the standard for [the officer] to have stopped the vehicle was[,] is there reasonable suspicion that this object is blocking or cutting off from sight or blocking an unhampered, ... unrestricted view of the highway? Well, there is reason to believe that it could be, because there is an object dangling. He is entitled constitutionally to investigate further. So the Court believes that the presence of the object is, in fact, sufficient reasonable suspicion to justify a detention of the vehicle.
Id. (emphasis added).[8] It is the court’s holding — not the judge’s initial remarks from the bench — that accompanies the final order on appeal to us. Viewed in context, none of the judge’s initial remarks can be fairly deemed a “factual finding.” Ante at 604 n. 7.[9] Nor should they be woven into a factual narrative as if they were.
*610 II.
A. The Reasonable Suspicion Standard
Reasonable suspicion is simply suspicion that is reasonable. It is not something more than suspicion. And it can hardly be called proof. To be sure, the degree of certitude required by reasonable suspicion is “ ‘considerably less than proof of wrongdoing by a preponderance of the evidence,’ and ‘obviously less demanding than that for probable cause.’ ” Perry v. Commonwealth, 280 Va. 572, 581, 701 S.E.2d 431, 436 (2010) (quoting United States v. Sokolow, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989)); see also Navarette v. California, — U.S. —, 134 S.Ct. 1683, 1687, 188 L.Ed.2d 680 (2014). Consequently, “the mere possibility of an innocent explanation does not necessarily exclude a reasonable suspicion that the suspect might be violating the law.” Morris v. City of Va. Beach, 58 Va.App. 173, 183, 707 S.E.2d 479, 483 (2011) (internal quotation marks omitted).
No one can be arrested on the basis of reasonable suspicion. It serves merely to justify a brief detention to investigate. Because the need for justification is quite low, so too is the justifying legal standard. See 4 Wayne R. LaFave, Search & Seizure § 9.5(b), at 658-59 (5th ed.2012) (noting that reasonable suspicion requires merely “that there exists at the time of the stop a substantial possibility — or, indeed, even a ‘moderate chance’ — that [unlawful] conduct has occurred, is occurring, or is about to occur” (emphasis added) (footnotes omitted) (quoting Safford Unified Sch. Dist. No. 1 v. Redding, 557 U.S. 364, 371, 129 S.Ct. 2633, 2639, 174 L.Ed.2d 354 (2009))).
In suppression hearings, a police officer usually takes the stand and describes what he saw and, occasionally, why he did what he did. While the first part is highly relevant, the second is not. When assessing the legality of an officer’s actions, his “subjective motivation is irrelevant.” Robinson v. *611 Commonwealth, 273 Va. 26, 37, 639 S.E.2d 217, 223 (2007) (quoting Brigham City v. Stuart, 547 U.S. 398, 404, 126 S.Ct. 1943, 1948, 164 L.Ed.2d 650 (2006)). A police officer’s “action is ‘reasonable’ under the Fourth Amendment, regardless of the individual officer’s state of mind, ‘as long as the circumstances, viewed objectively, justify the action.’ ” Stuart, 547 U.S. at 404, 126 S.Ct. at 1948 (brackets omitted) (quoting Scott v. United States, 436 U.S. 128, 138, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978)); see also Navarette, — U.S. at —, 134 S.Ct. at 1687. Indeed, settled precedent governing Fourth Amendment cases has “repeatedly rejected a subjective approach.” Fernandez v. California, — U.S. —, 134 S.Ct. 1126, 1134, 188 L.Ed.2d 25 (2014) (internal quotation marks omitted).
Put another way, a court should thus make “ ‘an objective assessment of the officer’s actions in light of the facts and circumstances confronting him at the time,’ and not on the officer’s actual state of mind at the time the challenged action was taken.” Maryland v. Macon, 472 U.S. 463, 470-71, 105 S.Ct. 2778, 2783, 86 L.Ed.2d 370 (1985) (quoting Scott, 436 U.S. at 138, 98 S.Ct. at 1724). Consequently, an “officer’s subjective characterization of observed conduct is not relevant ” to an objective application of the Fourth Amendment. Jones v. Commonwealth, 279 Va. 665, 673, 691 S.E.2d 801, 805 (2010) (emphasis added and internal quotation marks omitted); see also Stuart, 547 U.S. at 404, 126 S.Ct. at 1948.[10]
It necessarily follqws that, when deciding a suppression motion, a court should not limit itself “to what the stopping officer says or to evidence of his subjective rationale,” Raab v. Commonwealth, 50 Va.App. 577, 583 n. 2, 652 S.E.2d 144, 148 n. 2 (2007) (en banc) (quoting United States v. Brown, 232 *612 F.3d 589, 594 (7th Cir.2000)).[11] Courts should instead “look to the record as a whole to determine what facts were known to the officer and then consider whether a reasonable officer in those circumstances would have been suspicious.” LaFave, supra, § 9.5(a), at 647 n. 22 (quoting United States v. McKie, 951 F.2d 399, 402 (D.C.Cir.1991)). Because the reasonable suspicion test “is purely objective,” the Terry standard imposes “no requirement that an actual suspicion by the officer be shown.” Id. § 9.5(a), at 647 (second emphasis added).
Citing United States v. Sokolow, 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989), the majority asserts that an officer making a Terry stop must actually articulate the articulable facts that gave rise to his personal suspicion. Sokolow does not stand for that proposition. Nor do any of the other cases cited by the majority opinion. Sokolow simply restates that the “totality of the circumstances,” id. at 8, 109 S.Ct. at 1585 (quoting United States v. Cortez, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)), must give rise to “articulable facts that criminal activity ‘may be afoot,’ ” id. at 7, 109 S.Ct. at 1585 (quoting Terry v. Ohio, 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968)). This does not mean that the facts must actually be articulated by the officer on the witness stand or that any such articulation, by itself, must be sufficient to establish reasonable suspicion. The majority’s assertion to the contrary is inconsistent with binding en banc precedent from our Court, Raab, 50 Va.App. at 583 n. 2, 652 S.E.2d at 148 n. 2,[12] as well as the uniform view among courts that have *613 addressed this issue.[13]
B. Obstructing a Driver’s “Clear View” of the Highway
As a provision of the Virginia Motor Vehicle Code, Code § 46.2-1054 prohibits, among other things, any object from being “suspended from any part of the motor vehicle in such a manner as to obstruct the driver’s clear view of the highway through the windshield, the front side windows, or the rear window.” This portion of the statute has three components: (i) something “suspended,” (ii) that serves to “obstruct” a “clear view” of the highway, (iii) through any window of the vehicle (except for the rear side windows). Id.
By statute, a highway includes “the entire width between the boundary lines of every way or place open to the use of the public for purposes of vehicular travel in the Commonwealth, including the streets and alleys.” Code § 46.2-100 (emphasis added). A highway is not — as Mason presumes — simply the stretch of pavement immediately in front of a driver’s vehicle. Under Virginia law, a “highway” is not limited “to a hard-surfaced or partly hard-surfaced way or to a dirt and gravel way. It does not confine a highway to the main-travelled portion of the way or to lanes specifically designated for vehicular traffic.” Crouse v. Pugh, 188 Va. 156, 164-65, 49 S.E.2d 421, 426 (1948); see also Jessee v. Slate, 196 Va. 1074, 1083, 86 S.E.2d 821, 826 (1955).
Because a “highway” includes the “entire width of the boundary lines” of the “way or place” used by vehicular traffic, *614 Code § 46.2-100, it includes overhead highway signs,[14] on-ramps and off-ramps, merge lanes, deceleration lanes, roadways,[15] bridges,[16] intersections,[17] shoulders,[18] pedestrian crosswalks,[19] and shared-use paths.[20] Thus, a “clear view” of a “highway,” as used in Code § 46.2-1054, no doubt means the pavement itself and everything physically on it. It would make no sense for Code § 46.2-1054 to prohibit a dangling object from obstructing a driver’s view of the pavement directly in front him but not a vehicle, bicyclist, or pedestrian[21] moving across that same pavement.
In this case, Officer Richards testified that he “clearly” observed the parking pass prior to stopping the vehicle. App. at 31. The parking pass is an exhibit. We need no description *615 of it from the officer. We are looking at the very thing that the officer said he clearly saw: an opaque plastic card that is five inches long and three inches wide. And the trial judge had something even better. He took a “view of the scene” to determine if the parking pass could obstruct a driver’s vision in a vehicle similar to the one that the officer had stopped. Id. at 101; see Oral Argument Audio at 9:47 to 9:55, 26:04 to 26:30.
Given these facts, a reasonable officer could suspect that the opaque, five-by-three-inch parking pass dangling from a rear-view mirror might violate Code § 46.2-1054 and thus warrant an investigatory stop to find out if it in fact did. Several scenarios show why. The bottom of the parking pass would be at or slightly above eye level for a driver of average height. The parking pass could be at an angle that might partially block a driver’s clear view of a vehicle ahead and to the right of him. If that vehicle put on its left-turn signal, for example, the driver with the parking pass might not see it at all— particularly when the vehicle is merging into highway traffic from an on-ramp. If a driver simply wanted to make a right turn at an intersection, the parking pass could partially obscure his field of vision. An enhanced risk would exist when the driving occurs at night and only the rear running lights of a vehicle ahead and to the right are visible. Consider, too, highway signs that are often placed overhead and on the right shoulder of the highway.[22] A person of any height could have his clear view of highway signs partially obstructed by the parking pass especially, once again, during nighttime driving.
Under settled law, an officer need not have proof beyond a reasonable doubt of any of these scenarios before he makes a vehicular stop. Nor does he need to be convinced by a preponderance of the evidence. To be sure, the quantum of confidence need not even rise to the level of probable cause. See Perry, 280 Va. at 581, 701 S.E.2d at 436. He need only have a reasonable suspicion of a violation of Code § 46.2-1054, *616 which merely requires that he be aware of articulable facts suggesting that the parking pass could be non-compliant with the statute.
Though it was legally unnecessary for Officer Richards to testify that he subjectively believed the parking pass could have obscured the driver’s clear view of the highway, Raab, 50 Va.App. at 583 n. 2, 652 S.E.2d at 148 n. 2, he did in fact come to this conclusion. Within seconds of stating that he “clearly” saw the parking pass, Officer Richards testified that he believed that it “could obstruct a driver’s view.” App. at 31. In context, he was speaking of the driver’s view of the highway— not something other than the highway.
III.
The trial court correctly held that a reasonable officer could make an investigatory stop of the vehicle to determine if, in fact, the parking pass violated Code § 46.2-1054.
I respectfully dissent.

. See also App. at 40-41 (The trial judge confirmed that "the question we have now is [whether there] is reasonable suspicion to believe that there is a traffic infraction taking placet] So again, is there reasonable suspicion to believe that [the parking pass] is obstructing ... the driver's clear view of the highway through the windshield? " (emphasis added)).

. We traditionally decline invitations to "fix upon isolated statements of the trial judge taken out of the full context in which they were made, and use them as a predicate for holding the law has been misapplied.” Damon v. York, 54 Va.App. 544, 555, 680 S.E.2d 354, 360 (2009) (internal quotation marks omitted); see also White v. White, 56 Va.App. *610 214, 217-18, 692 S.E.2d 289, 291 (2010) ("We are particularly skeptical ... of appellate efforts to piece together ... fragmented remarks from the bench” in an effort to undermine the court's ultimate holding.).

. See also Bond v. United States, 529 U.S. 334, 338 n. 2, 120 S.Ct. 1462, 1465 n. 2, 146 L.Ed.2d 365 (2000); Whren v. United States, 517 U.S. 806, 813, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89 (1996); Scott, 436 U.S. at 138, 98 S.Ct. at 1723; United States v. Johnson, 734 F.3d 270, 275 (4th Cir.2013); United States v. Singh, 363 F.3d 347, 356 (4th Cir.2004); United States v. McKie, 951 F.2d 399, 402 (D.C.Cir.1991); Harris v. Commonwealth, 276 Va. 689, 697, 668 S.E.2d 141, 146 (2008); Robinson, 273 Va. at 37-38, 639 S.E.2d at 223-24.

. See also Washington v. Commonwealth, 60 Va.App. 427, 434, 728 S.E.2d 521, 525 (2012); Shifflett v. Commonwealth, 58 Va.App. 732, 736 n. 2, 716 S.E.2d 132, 135 n. 2 (2011); Morris, 58 Va.App. at 179, 707 S.E.2d at 481; Thomas v. Commonwealth, 57 Va.App. 267, 273-75, 701 S.E.2d 87, 90-91 (2010); Armstead v. Commonwealth, 56 Va.App. 569, 579 n. 7, 695 S.E.2d 561, 565 n. 7 (2010).

. The "interpanel accord doctrine" precludes a panel of our Court from altering the holding of a prior panel, Startin v. Commonwealth, 56 Va.App. 26, 39 n. 3, 690 S.E.2d 310, 316 n. 3 (2010) (en banc) (citing Atkins v. Commonwealth, 54 Va.App. 340, 343 n. 2, 678 S.E.2d 834, 835 n. 2 (2009)), aff'd, 281 Va. 374, 706 S.E.2d 873 (2011). All the more, *613 the doctrine precludes a panel from expressly or implicitly repudiating a prior en banc holding.

. See, e.g., United States v. Bailey, 622 F.3d 1, 5-6 (D.C.Cir.2010); Brown, 232 F.3d at 594; United States v. Ozbirn, 189 F.3d 1194, 1198-99 (10th Cir.1999); United States v. Swann, 149 F.3d 271, 272 (4th Cir.1998); United States v. Jones, 990 F.2d 405, 408 (8th Cir.1993); McKie, 951 F.2d at 402; United States v. Hawkins, 811 F.2d 210, 213 (3d Cir.1987); State v. Heminover, 619 N.W.2d 353, 357 (Iowa 2000), abrogated on other grounds by State v. Turner, 630 N.W.2d 601, 606 n. 2 (Iowa 2001); Zimmerman v. N.D. Dep’t of Transp. Dir., 543 N.W.2d 479, 483 (N.D.1996).

. See Code § 46.2-100 (defining a "traffic control device” as "a sign, signal, marking, or other device used to regulate, warn, or guide traffic placed on, over, or adjacent to a ... highway”).

. A "roadway,” narrower in scope than a highway yet still broad in terms of the surface area it includes, is defined as "that portion of a highway improved, designed, or ordinarily used for vehicular travel, exclusive of the shoulder.” Code § 46.2-100. A highway may itself "include two or more roadways.” Id.

. See Nelson v. Cnty. of Henrico, 10 Va.App. 558, 561, 393 S.E.2d 644, 646 (1990).

. See Code § 46.2-100 (defining "intersection” as certain areas of highways that "join one another,” cross an "intersecting highway,” or are crossed "by a pedestrian crosswalk”).

. A "shoulder” is defined as "that part of a highway between the portion regularly traveled by vehicular traffic and the lateral curbline or ditch.” Code § 46.2-100 (emphasis added); see also Jessee, 196 Va. at 1083, 86 S.E.2d at 826.

. See Code § 46.2-100 (defining "crosswalk” as a "part of a roadway”); see also supra note 17 (defining "intersection”).

. “Shared-use paths” include bikeways and other paths that are open to "pedestrians, skaters, users of wheel chairs or wheel chair conveyances, joggers, and other nonmotorized users.” Code § 46.2-100.

. Crouse, 188 Va. at 165, 49 S.E.2d at 426 (“The Motor Vehicle Code of Virginia recognizes the right of both the pedestrian and motorist to use the highways for travel.”).

. See supra note 14.