COURT OF APPEALS OF VIRGINIA

PUBLISHED

Present:   Judges Humphreys, Kelsey and Petty
Argued at Richmond, Virginia


LOREN ANTHONY MASON, JR.

                                       OPINION BY
v.      Record No. 1542-13-2          JUDGE ROBERT J. HUMPHREYS
                                  AUGUST 5, 2014

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF SUSSEX COUNTY
W. Allan Sharrett, Judge

Paul S. Roskin (Vergara & Associates, on brief), for appellant.

Kathleen B. Martin, Senior Assistant Attorney General (Mark R.
Herring, Attorney General, on brief), for appellee.


Loren Anthony Mason, Jr., ("Mason") was convicted at a bench trial in the Sussex

County Circuit Court ("trial court") of distribution of marijuana, possession of a Schedule I or II

controlled substance, and possession of a Schedule I or II controlled substance with the intent to

distribute. On appeal, Mason argues that the trial court erred in denying his motion to suppress

the evidence because the Commonwealth failed to prove that the officer had a reasonable and

articulable suspicion to stop the vehicle in which Mason was riding.

I.  BACKGROUND

Around 2:30 on the afternoon of March 3, 2012, Officer Willie Richards ("Officer

Richards") was parked on the side of the road operating stationary speed radar when he observed

a vehicle pass by with a "[d]angling object on the rearview mirror." Officer Richards executed a

traffic stop of the vehicle because he observed the "dangling object." He identified the driver of

the vehicle, Tony Jarrett ("Jarrett"), and "ran his information." When Officer Richards returned

to the stopped vehicle after running a search of Jarrett's information, he was going to issue

Jarrett summonses for the dangling object and failure to wear a seatbelt. However, before issuing any summonses, Officer Richards asked Jarrett if he would mind stepping out of the car. Jarrett complied. Jarrett walked to the back of the vehicle he was driving, and Officer Richards told Jarrett why he stopped him. Then Officer Richards asked Jarrett if he had any weapons on him. Jarrett said no. Officer Richards asked him "if he minded if [Officer Richards] patted him down." Jarrett said, "that's fine." Officer Richards patted Jarrett down for weapons. Officer Richards then saw a multi-colored sunglasses case sticking out of Jarrett's left rear pocket. Officer Richards asked Jarrett what was in his back pocket. Jarrett paused, pulled out the bag, and threw it on the car stating, "I'm not selling it, I'm just using it." Officer Richards opened the bag and found green leaf material inside. At that point, Officer Richards placed Jarrett in an investigatory detention and read him his Miranda rights. Up to this point, Mason was sitting in the front passenger seat of the vehicle. Upon the detention of Jarrett, Officer Parker, who was training under Officer Richards, pulled Mason out of the vehicle. Officer Parker checked Mason for weapons and walked him to the front of the police vehicle, parked directly behind the vehicle Jarrett and Mason were riding in.

Officer Richards began searching the stopped vehicle. Inside the vehicle, Officer Richards saw a black backpack sitting on top of a jacket in the middle of the backseat. Inside the backpack were about twenty to twenty-five individually wrapped bags in a larger bag, digital scales, cocaine, ecstasy pills, and a large amount of marijuana. After neither individual claimed ownership of the backpack, Officer Richards placed them both under arrest for possession. He searched Mason and found $3,381 in cash and a cell phone on his person.

Other evidence established that the backpack belonged to Mason. Mason filed a motion to suppress the evidence seized from the backpack, the evidence found on Mason's person, and any statements made by Mason at the time of his detention and arrest and while in the custody of

Officer Richards. Mason argued that the stop was based solely on Officer Richards's

observation of a parking pass that hung from the rearview mirror and that Officer Richards

lacked reasonable and articulable suspicion to stop the vehicle as that concept is defined in Terry

v. Ohio, 392 U.S. 1 (1968).

With the agreement of the parties, the trial court took up the suppression motion during

the course of Mason's trial. Officer Richards was questioned about his reason for stopping the

vehicle. The prosecutor asked, "what brought your attention to the vehicle again?" Officer

Richards replied, "Dangling object [sic] on the rearview mirror." Officer Richards subsequently

agreed with Mason's counsel that the dangling object, a parking pass, would block only a small

portion of the entire windshield. He also agreed that if a driver was looking straight ahead, the

object would not be in his field of vision at all. There was nothing about Jarrett's driving that

made Officer Richards believe that Jarrett's view was obstructed. The rearview mirror to which

the object was attached was in its normal position on the windshield. Mason's counsel

introduced the object into evidence through Officer Richards—it was a 3" x 5" parking pass

issued by the Department of Defense for use at Ft. Lee, the top portion of which hooks onto the

post that holds the rearview mirror (see below).[1]

---

[1] No effort was made to render the image as actual size because we recognize that those who publish our opinions, whether in printed and bound reports or in an on-line database, will not likely reproduce any image in actual size. We have, however, specifically noted the actual dimensions and included horizontal and vertical rulers as part of the image in the interest of maintaining contextual accuracy irrespective of future editorial decisions by others.



The trial court concluded, and both parties acknowledged, that this pass hung *behind* the rearview mirror from the driver's perspective. App. at 33-34.

On redirect, the Commonwealth asked, "So it's not clear that you can't—you can't see through it, so it could obstruct a driver's view?" Officer Richards replied, "It could, yes, ma'am." After some discussion off the record, Officer Richards was recalled and the Commonwealth resumed questioning him:

> [Commonwealth:] What about [the vehicle] caught your attention?
>
> [Officer Richards:] Just the—initially when it was coming down I was running radar, so I was watching it come down the hill to make sure it wasn't speeding. And when it got a little closer, I saw the tag on the rearview mirror.
>
> [Commonwealth:] And was it moving, or anything about it cause you concern for the driver?

- 4 -

[Officer Richards:]  Just that there was a dangling object.  I mean, I can't say it was moving back and forth, just that I saw it when it came by.

[Commonwealth:]  Were you able to see everything from your vantage point when you saw the vehicle with the object in the window?  Were you able to see everything in the car with that object there?

[Officer Richards:]  For the most part, yes.

[Commonwealth:]  And when you say "for the most part"?

[Officer Richards:]  I could see the two, the passenger and the driver.

[Commonwealth:]  Okay.  Once you pulled the vehicle over, did you get in the vehicle?

[Officer Richards:]  Get in it?

[Commonwealth:]  Yes, the stopped vehicle?

[Officer Richards:]  Eventually, yes, ma'am.

[Commonwealth:]  And did you look at the rearview mirror?

[Officer Richards:]  Yes, ma'am.

[Commonwealth:]  And what about it, if anything, did you observe?

[Officer Richards:]  Just there was a dangling object on it.

[Commonwealth:]  Did it—when you got in, were you on the driver's side or passenger's side, do you remember?

[Officer Richards:]  Well, when I went into the vehicle to search it, it was on the passenger side.

[Commonwealth:]  You got in on the passenger side?

[Officer Richards:]  Yes.

[Commonwealth:]  Did you look out of the window?

[Officer Richards:]  No, ma'am.  Not to see—not to determine, you know, whether I could see out of the window or not where the dangling object was, no, ma'am.

[Commonwealth:]  So you didn't look?

[Officer Richards:]  No.

Mason's counsel renewed his motion "even more strenuously" based on Officer Richards's testimony that the stop was based on the dangling object, and not because the officer thought the object was in any way obstructing the driver's view.  The Commonwealth's position in response was that any object that dangles from the rearview mirror justifies the stop of the vehicle.

Throughout its deliberation over the motion and extensive discussions with the parties, the trial court consistently and repeatedly stated that the parking pass would not obstruct the driver's view of the highway.  For example, the trial court found that the parking pass would not obstruct the view of the driver at all if hung "on any car in America."  "I don't think it obstructs anybody's view."  "It seems to me that object hanging from the mirror—it's readily obvious, it's not obstructing anybody's view."  "It hangs up in the rearview mirror, which is up here.  That doesn't obstruct your view.  You don't even see the highway up there.  The highway is out here. It doesn't obstruct your view at all."  "The object that dangled didn't substantially obstruct a view.  You could get in the car and essentially look right through it.  But it did dangle down and it was there."  The trial court simultaneously and repeatedly acknowledged that the issue, however, was whether the object gave rise to reasonable suspicion to believe that a traffic infraction was taking or had taken place.  The trial court ordered additional briefing by the parties on this issue and continued the matter for further consideration of the issue.  When the parties reconvened several months later, the trial court repeated that "I think everyone would agree that [the parking pass] didn't substantially obstruct the driver's view" and then noted that

the issue was "whether or not essentially the mere fact of a dangling object gives the officer reasonable suspicion to stop to determine whether or not the object . . . obstructs the driver's clear view of the highway." The trial court then held that there is reason to believe that the object could be blocking the sight of the driver simply "because there is an object dangling." The trial court continued, "[The officer] is entitled constitutionally to investigate further. So the Court believes that the presence of the object is, in fact, sufficient reasonable suspicion to justify a detention of the vehicle." The trial court denied the motion to suppress the evidence and found Mason guilty as charged.

## II. ANALYSIS

Mason argues on appeal that "the trial court erred in failing to grant [his] motion to suppress controlled substances seized by Officer Richards of the Waverly Police Department when the Commonwealth failed to meet its burden in showing that he had reasonable and articulable suspicion to stop the vehicle in which Loren Mason was riding."

Officer Richards pulled the vehicle over after observing an object attached to the rearview mirror. Code § 46.2-1054 provides in part,

> It shall be unlawful for any person to drive a motor vehicle on a highway in the Commonwealth with any object or objects, other than a rear view mirror, sun visor, or other equipment of the motor vehicle approved by the Superintendent, suspended from any part of the motor vehicle *in such a manner as to obstruct the driver's clear view of the highway through the windshield*.

(Emphasis added).

On appeal, it is the appellant's burden to show that the trial court's denial of a motion to suppress constituted reversible error. Lovelace v. Commonwealth, 37 Va. App. 120, 124, 554 S.E.2d 688, 689 (2001). "[D]eterminations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal." Ornelas v. United States, 517 U.S. 690, 699 (1996). "In performing such analysis, we are bound by the trial court's findings of historical fact unless

'plainly wrong' or without evidence to support them and we give due weight to the inferences drawn from those facts by resident judges and local law enforcement officers." McGee v. Commonwealth, 25 Va. App. 193, 198, 497 S.E.2d 259, 261 (1997) (en banc).

A. Code § 46.2-1054 does not Proscribe *All* Suspended Objects

Initially, we note that both at trial and on appeal, the Commonwealth advanced its position that *any* object suspended from a rearview mirror would provide an officer with reasonable suspicion to justify pulling the car over and this argument was ultimately adopted by the trial court in its holding. However, Code § 46.2-1054 proscribes only suspended objects that *obstruct the driver's clear view of the highway*. What exactly constitutes an obstruction of the clear view of the highway is not specified by the statute. However, appellant raises no issue regarding the vagueness of the statute and its constitutionality is presumed, thus we do not consider the applicability of our Supreme Court's decision in Tanner v. City of Virginia Beach, 277 Va. 432, 438, 674 S.E.2d 848, 852 (2009). What is clear is that the statute does not proscribe *all* objects suspended from the interior of a motor vehicle. If the General Assembly had intended to proscribe all objects suspended from any part of a motor vehicle, it would have said so. See Holsapple v. Commonwealth, 266 Va. 593, 599, 587 S.E.2d 561, 564-65 (2003) (courts may not add language to a statute that the General Assembly has not seen fit to include). Thus, and as discussed more fully *infra*, in order for an officer to have reasonable suspicion that a driver is violating Code § 46.2-1054, the evidence must support an officer's reasonable suspicion that a suspended object is obstructing the driver's view of the road and not merely that there is a suspended object. A holding along the lines urged by the Commonwealth that any and all objects suspended from a mirror in a motor vehicle provide reasonable suspicion that the driver is violating Code § 46.2-1054, would amount to a *per se* rule obviating the need for *particularized* suspicion that an individual is engaged in wrongdoing before executing a Fourth

- 8 -

Amendment stop and detention.  See United States v. Cortez, 449 U.S. 411, 417-18 (1981).  The United States Supreme Court has said that "for the most part *per se* rules are inappropriate in the Fourth Amendment context."  United States v. Drayton, 536 U.S. 194, 201 (2002) (favoring consideration of the totality of the circumstances of the encounter when determining if a citizen has been seized by police).  The *per se* rule urged by the Commonwealth would stand in stark contrast to the established precedent of the United States Supreme Court requiring an officer to form individualized suspicion that a crime is being or is about to be committed and we reject the Commonwealth's argument supported by the dissent that the statute permits every vehicle with any object suspended from the rearview mirror to be stopped based solely because of that fact.[2]  Thus, we turn to whether the totality of the circumstances of *this* case provide reasonable suspicion of criminal activity for the stop of the vehicle.

B.  Reasonable Suspicion and the Requirement that Facts Supporting it be Articulated

We begin, as we must in these cases, with the Fourth Amendment to the United States Constitution, which provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."

> It is quite plain that the Fourth Amendment governs "seizures" of
> the person which do not eventuate in a trip to the station house and
> prosecution for crime—"arrests" in traditional terminology.  It
> must be recognized that whenever a police officer accosts an

---

[2] The obvious legislative purpose behind Code § 46.2-1054 is a recognition that many who drive motor vehicles on the highways of the Commonwealth attach different objects and devices to their vehicles for various reasons.  Some are purely decorative such as the iconic "fuzzy dice" or hold personal or sentimental meaning such as a graduation tassel or rosary beads, while still other objects have utilitarian uses such as GPS devices, toll transponders, air fresheners or, as in this case, parking permits.  Significantly, these items are permitted to be attached to a vehicle *unless* they are of a size or positioned in such a way as to impair the ability of the driver to view the road.  Were we to adopt the interpretation advanced by the Commonwealth and supported by the dissent, *all* who do so would automatically provide police with a reasonable suspicion to detain them without regard to whether there is any evidence articulated by the officer that the article in question may actually be a hazard to the operation of the vehicle.

> individual and restrains his freedom to walk away, he has "seized"
> that person.

*Terry*, 392 U.S. at 16. "Prior to *Terry v. Ohio*, any restraint on the person amounting to a seizure for the purposes of the Fourth Amendment was invalid unless justified by probable cause." *Florida v. Royer*, 460 U.S. 491, 498 (1983). "*Terry* created a limited exception to this general rule: certain seizures are justifiable under the Fourth Amendment if there is articulable suspicion that a person has committed or is about to commit a crime." *Id.*

Even a cursory review of reasonable suspicion cases reveals often repeated language requiring specific facts in support of an officer's suspicion that criminal activity is afoot. "[T]he police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989). "[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21. "A court sitting to determine the existence of reasonable suspicion must require the agent to articulate the factors leading to that conclusion." *Sokolow*, 490 U.S. at 10; *see also* *United States v. Dennis*, 115 F.3d 524, 532 (7th Cir. 1997) ("[I]n reviewing a reasonable suspicion determination, we require law enforcement authorities to articulate the specific characteristics exhibited by the person or object to be detained which aroused the authorities' suspicion in the particular case before us, and we determine whether those characteristics would reasonably arouse suspicion under the circumstances presented in the case." (citing *Sokolow*, 490 U.S. at 10)). "The officer, of course, must be able to articulate something more than an 'inchoate and unparticularized suspicion or hunch.'" *Sokolow*, 490 U.S. at 7 (quoting *Terry*, 392 U.S. at 27); *see also* *Rudolph v. Commonwealth*, 277 Va. 209, 210, 722 S.E.2d 527, 528 (2009) ("To establish reasonable suspicion, an officer must be able to articulate

more than an unparticularized suspicion or 'hunch' that criminal activity is afoot."). "This demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence." Terry, 392 U.S. at 21 n.18.[3]

A reviewing court must consider the totality of the circumstances known to the officer at the time of the stop when determining whether the officer's suspicion was reasonable:

> The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard: *would the facts available to the officer at the moment of the seizure* or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate? Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction.

Terry, 392 U.S. at 21-22 (emphasis added). "[T]he totality of the circumstances – the whole picture – must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." Cortez, 449 U.S. at 417-18; see also Navarette v. California, 134 S. Ct. 1683, 1687 (2014) (the Fourth Amendment permits traffic stops "when a law enforcement officer has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity'" (quoting Cortez, 449 U.S. at 417-18); and holding that a tipster can provide an officer

---

[3] "The Fourth Amendment applies to seizures of the person, including brief investigatory stops such as the stop of the vehicle . . . . An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." Cortez, 449 U.S. at 417 (citations omitted); see also Delaware v. Prouse, 440 U.S. 648, 663 (1979) (stopping an automobile and detaining the driver is unreasonable under the Fourth Amendment unless there is at least articulable and reasonable suspicion that the vehicle or an occupant is subject to seizure for violation of the law). When a police officer makes a traffic stop, the passenger is seized within the meaning of the Fourth Amendment and may challenge the constitutionality of the stop. Brendlin v. California, 551 U.S. 249, 251 (2007).

- 11 -

with enough particular facts to give rise to the officer's reasonable suspicion); United States v. Edmonds, 240 F.3d 55, 59 (D.C. Cir. 2001) ("the question of whether reasonable suspicion existed can only be answered by considering the totality of the circumstances as the officer on the scene experienced them").

In Sibron v. New York, 392 U.S. 40 (1968), a companion case to Terry, the Court considered whether the officer had reasonable grounds to believe that Sibron was armed and dangerous, so as to justify the officer's self-protective search for weapons. "The police officer is not entitled to seize and search every person whom he sees on the street or of whom he makes inquiries. Before he places a hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so." Id. at 64. "In the case of the self-protective search for weapons, *he must be able to point to particular facts* from which he reasonably inferred that the individual was armed and dangerous." Id. (emphasis added) (citing generally Terry, 392 U.S. 1). The Court found that the officer's testimony revealed no such facts—the officer did not testify that when Sibron put his hand in his pocket that he feared that Sibron was going for a weapon, and he "never at any time put forth the notion that he acted to protect himself." Id. at 64 n.21. The Court found that the trial court should have suppressed the evidence found in the officer's search of Sibron. Id. at 68.

In Brown v. Texas, 443 U.S. 47 (1979), the Court found that the officer failed to articulate a reasonable suspicion for stopping Brown. Officers observed Brown and another man walking away from one another in an alley. Officer Venegas testified that he and the other officer "believed the two had been together or were about to meet until the patrol car appeared." Id. at 48. The officers then stopped Brown because the situation "looked suspicious and [they] had never seen [Brown] in the area before." Id. at 49. The area was known for drug trafficking, however, "the officers did not claim to suspect [Brown] of any specific misconduct, nor did they

have any reason to believe that he was armed." Id. The Court noted in its analysis that "none of the circumstances preceding the officers' detention of [Brown] justified a reasonable suspicion that he was involved in criminal conduct." Id. at 51-52. "Officer Venegas testified at appellant's trial that the situation in the alley 'looked suspicious,' but he was unable to point to any facts supporting that conclusion." Id. at 52. The Court noted that in this case the officer's testimony "is to be distinguished from the observations of a trained, experienced police officer who is able to perceive and articulate meaning in given conduct which would be wholly innocent to the untrained observer." Id. at 52 n.2. "In the absence of any basis for suspecting appellant of misconduct, the balance between the public interest and appellant's right to personal security and privacy tilts in favor of freedom from police interference." Id. at 52. "When . . . a stop is not based on objective criteria, the risk of arbitrary and abusive police practices exceeds tolerable limits." Id.

Likewise, in this case, Officer Richards did not testify either to facts sufficient to suspect the driver or Mason of any specific misconduct or reasons why his training and experience would permit further investigation of conduct which to the untrained eye appears to be wholly innocent. Although the prosecutor asked Officer Richards if anything about the dangling object concerned him, his response was "just that there was a dangling object."[4] We note that in some cases, "'wholly lawful conduct might justify the suspicion that criminal activity was afoot.'" Sokolow, 490 U.S. at 9 (quoting Reid v. Georgia, 448 U.S. 438, 441 (1980)). However, in determining whether the officer's suspicions were reasonable the relevant inquiry is the degree of suspicion that attaches to particular types of noncriminal acts. Id. at 10.

---

[4] Although we do not consider it in our reasonable suspicion analysis, we note that Officer Richards did not pursue any investigation of his stated reason for the stop to see if the parking pass actually obstructed the driver's view of the road from inside the car.

- 13 -

In <u>Reid v. Georgia</u>, 448 U.S. 438 (1980), the Supreme Court determined that federal narcotics agents seized Reid without an articulable suspicion that he was unlawfully transporting drugs—Reid's conduct was mostly typical of any number of innocent travelers and the individual conduct specific to Reid was not indicative of any wrongdoing. The evidence at the suppression hearing established that Reid arrived at the Atlanta Airport on an early morning flight from Fort Lauderdale, Florida. <u>Id.</u> at 439. The agent testified that Fort Lauderdale is a principal place of origin of much of the cocaine sold in the country. <u>Id.</u> at 441. As Reid proceeded through the airport, the agents observed him looking backward in the direction of a second man. <u>Id.</u> at 439. Both men carried similar shoulder bags. The men walked past the baggage claim, then spoke briefly, and left the terminal building together; at this point agents stopped them and found drugs in Reid's bag. <u>Id.</u> The Court of Appeals of Georgia found that the agents had reasonable suspicion of Reid's wrongdoing because (1) Reid arrived from a city known for its cocaine production, (2) Reid arrived "early in the morning, when law enforcement activity is diminished," (3) Reid and his associate "appeared to the agent to be trying to conceal the fact that they were traveling together," and (4) they only carried shoulder bags and no other luggage. <u>Id.</u> at 440-41.

However, the United States Supreme Court reversed and concluded that "the agent could not, as a matter of law, have reasonably suspected the petitioner of criminal activity on the basis of these observed circumstances." <u>Id.</u> at 441. Of the evidence relied on, only the fact that petitioner occasionally looked back toward his associate relates to his particular conduct. <u>Id.</u> "The other circumstances describe a very large category of presumable innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation

as there was in this case could justify a seizure." Id.[5] Nor could the Court agree that the manner in which Reid and his associate walked through the airport "reasonably could have led the agent to suspect them of wrongdoing"—this was "simply too slender a reed to support the seizure in this case." Id.

In this case, Officer Richards, the only witness who testified about the circumstances of the stop, did not articulate facts that would support any particularized suspicion that Jarrett was committing a traffic offense when he pulled the car containing Mason over. He only asserted that he observed an object hanging from the rearview mirror as the vehicle passed, and it is clear from his testimony that he mistakenly believed that *any* object hanging from the mirror constituted an offense. Officer Richards never testified to any facts or circumstances that suggested a reason to suspect that this 3" x 5" object hanging from behind a mirror affixed to the top of the vehicle's windshield obstructed the driver's view of any part of the highway. On cross-examination the officer confirmed that the only thing he knew at the point of the stop was the "dangling object." Officer Richards did not assign suspicion to this fact based on his experience as a law enforcement officer in the field. See United States v. Sigmond-Ballesteros, 285 F.3d 1117, 1123 (9th Cir. 2002) (where the court considered that the agent never testified about the relevance of the innocent activity of the suspect or that, in his experience, the suspect's actions indicated criminal activity).

The prosecutor stipulated that Officer Richards did not notice anything unusual about the driving of the vehicle. The officer acknowledged that the parking pass would only take up a

_____

[5] Similarly, the United States Court of Appeals for the Eleventh Circuit has noted that "neither police officers nor courts should sanction as 'reasonably suspicious' a combination of factors that could plausibly describe the behavior of a large portion of the motorists engaged in travel upon our interstate highways." United States v. Tapia, 912 F.2d 1367, 1371 (11th Cir. 1990); accord United States v. Rodriguez-Sanchez, 23 F.3d 1488, 1492 (9th Cir. 1994) (holding that reasonable suspicion cannot be based "on broad profiles which cast suspicion on entire categories of people without any individualized suspicion of the particular person to be stopped").

small portion of the entire windshield and that it would not be in a driver's view when looking straight ahead. We further note, as did the trial court, that the parking pass hung behind the rearview mirror, reducing the area of the parking pass visible to the driver. On redirect, the prosecutor asked Officer Richards, "So it's not clear that you can't—you can't see through it [meaning the parking pass], so it could obstruct a driver's view?" Officer Richards replied, "It could, yes, ma'am." Even the officer's acknowledgement in court that the pass could possibly obstruct a driver's view specifically because of its opaque nature, does not equate to never articulated facts supporting a reasonable suspicion at the time of the stop that the pass was obstructing the driver's view *of the highway*. [6] Moreover, the absence of the articulation of facts supporting a reasonable suspicion in Officer Richards's testimony is consistent with the trial court's statements after viewing the exhibit that the parking pass could not obstruct a driver's view of the highway if hung "on any car in America" and the trial court's later statement made immediately prior to its ruling that, "I think everyone would agree that [the parking pass] didn't substantially obstruct the driver's view." [7]

---

[6] This is the central point of our disagreement with the dissent. A highway includes "the *entire width between the boundary lines* of every way or place open to the use of the public for purposes of vehicular travel in the Commonwealth, including the streets and alleys." Code § 46.2-100. Barring the approach advocated by the Commonwealth and the dissent that *any* object affixed to the interior of a vehicle *per se* generates reasonable suspicion as a matter of law, neither the testimony of Officer Richards nor the parking pass itself, provides reason to believe that the trial court's unequivocal and repeated statements regarding this object's inability, from its size and location in the vehicle, to obstruct *any* part of the highway were either nonsense or legally meaningless.

[7] This latter statement by the trial court immediately prior to its holding seems to us to contradict the dissent's assertion that "none of the judge's initial remarks can be fairly deemed a 'factual finding.'" Indeed, and significantly unlike the situation in Commonwealth v. Bryant, No. 0076-04-1, 2004 Va. App. LEXIS 283, at *4 (Va. Ct. App. June 15, 2004), cited by the dissent, we conclude that these two unequivocal statements by the trial court are indeed a factual finding binding upon this Court and the holding the dissent contends is a repudiation of these statements is actually an erroneous adoption by the trial court of the Commonwealth's legal argument that *any* opaque object attached to a vehicle constitutes reasonable suspicion of a violation of Code § 46.2-1054 and justifying a stop of the vehicle.

Officer Richards's observation of the parking pass attached to the rearview mirror is descriptive of wholly innocent behavior exhibited by many drivers on the road who have objects attached to their windshield or rearview mirror that do not obstruct their view of the road. We note that there is little distinction between the size of the parking pass, which when hanging would be covered in part by the rearview mirror itself, and the size of various opaque stickers and other objects that various government agencies require or authorize to be displayed on the windshield of a motor vehicle, such as a state vehicle inspection sticker, Code § 46.2-1163, or an E-ZPass toll transponder, Code § 33.1-23.03:10(C). Without any particular or individualized facts suggesting or supporting a suspicion that this parking pass was obstructing the driver's view of the road, we conclude that the totality of the circumstances known to the officer at the time of the stop in this case are insufficient to support a reasonable suspicion that the driver was violating the law.

## III. CONCLUSION

We hold that the traffic stop and seizure of Mason violated his Fourth Amendment rights because the facts and circumstances available to the officer at the time of the stop did not support a reasonable suspicion that the driver was violating or about to violate the law. However, despite our holding that the stop here is constitutionally infirm, we cannot say based upon the record before us that the exclusionary rule necessarily requires the suppression of the evidence in this case. See Hudson v. Michigan, 547 U.S. 586, 592 (2006) (the exclusionary rule does not apply to "'every item of evidence that has a causal connection with police misconduct'" (quoting Segura v. United States, 468 U.S. 796, 829 (1984) (Stevens, J., dissenting))). The trial court, having denied the motion to suppress, made no determination as to whether Jarrett's consent to search his person, which led to the search of the car and the discovery of evidence against Mason, attenuated the illegality of the stop as it pertained to and affected Mason. See

- 17 -

Schenckloth v. Bustamonte, 412 U.S. 218, 248-49 (1973) (whether an individual's consent to a search was voluntary is a factual question); United States v. Seidman, 156 F.3d 542, 548 (4th Cir. 1998) (after the trial court determined that the officer entered Seidman's residence in violation of the Fourth Amendment and that Seidman voluntarily consented to the conversation with the officer, the trial court should have gone further and determined "whether the taint arising from the unlawful entry was sufficiently attenuated by the consent"). Therefore, we reverse and remand for a new trial consistent with this opinion if the Commonwealth is so advised.

Reversed and remanded.

KELSEY, J., dissenting.

The case is important not because I think it is a good or bad policy to stop vehicles for what some consider to be an insignificant vehicular safety violation, but because I disagree with the majority's factual narrative and believe that much of the majority's legal analysis is out of sync with settled precedent.

I.

I will restate the facts as I believe we must — "in the light most favorable to the Commonwealth, giving it the benefit of any reasonable inferences." Glenn v. Commonwealth, 49 Va. App. 413, 416, 642 S.E.2d 282, 283 (2007) (*en banc*) (internal quotation marks omitted), aff'd, 275 Va. 123, 654 S.E.2d 910 (2008).

A police officer testified that, while operating stationary radar, he saw "a vehicle that came by with a dangling object." App. at 21. The object was dangling from the rearview mirror. Id. at 22. At the suppression hearing, the officer identified the object that he observed. It was an opaque parking pass, measuring five inches long and three inches wide. The parking pass was introduced as an exhibit at the suppression hearing. The officer testified that he "saw it *clearly*" as the vehicle "went by" him. Id. at 31 (emphasis added). Two questions later, when asked if the dangling parking pass that he so clearly observed "could obstruct a driver's view," the officer said unequivocally, "*It could, yes, ma'am*." Id. (emphasis added).

At the suppression hearing, the trial judge made various remarks from the bench suggesting his inclination to grant the motion to suppress. After making these remarks, however, the judge requested briefing and "asked for additional time to consider" the issue. Id. at 101. The trial judge also later examined the parking pass and took a "view of the scene," id., to determine if the parking pass could obstruct a driver's vision in a vehicle similar to the one that

- 19 -

the officer had stopped.  <u>See</u> Oral Argument Audio at 9:47 to 9:55, 26:04 to 26:30 (stipulation of counsel).  The parking pass, reproduced in its actual size, looks like this:



Later, on the day of trial, the judge advised counsel that he had reconsidered his earlier remarks during the suppression hearing.  He said that his initial "concern" was that the parking pass did not "*substantially* obstruct" the driver's view of the highway.  App. at 102 (emphasis added).  But after reviewing the caselaw "stacked up against me," the judge explained, he realized that neither the statute nor the reasonable suspicion standard required a *substantial* obstruction.  <u>Id.</u> at 105.  He noted that one of the cases making this point was an unpublished opinion from our Court, <u>Commonwealth v. Bryant</u>, No. 0076-04-1, 2004 Va. App. LEXIS 283, at *4 (Va. Ct. App. June 15, 2004) (Humphreys, J.).

In Bryant, we *reversed* a trial court for granting a suppression motion in a similar context. There, an officer stopped a vehicle after observing an "air freshener hanging from the rear view mirror" that the officer believed "could" have partially obstructed the driver's view. Id. (internal quotation marks omitted). Considerably smaller than the opaque parking pass in our case, the air freshener in Bryant was "in the shape of a dragon" and was "three-and-a-half by one-and-a-half inches." Id. at *5 (internal quotation marks omitted). Under these facts, we held that the trial court plainly erred by concluding that these facts did not give rise to a reasonable suspicion that the vehicle could have been in violation of Code § 46.2-1054. Id. at *15-16; see also Richardson v. Commonwealth, No. 0946-13-3, 2014 Va. App. LEXIS 98, at *4 (Va. Ct. App. March 18, 2014) (Huff, J.) (upholding a traffic stop where the officer observed that an "air freshener could be in violation of Virginia's 'obstruction of view' statute").

The trial judge also relied upon Pegram v. Commonwealth, No. 1041-95-2, 1996 Va. App. LEXIS 611, at *4 (Va. Ct. App. Sept. 24, 1996) (Willis, J.), in which we similarly noted that an officer had "stopped the vehicle based upon his belief that it was being operated in violation of Code § 46.2-1054." The object in that case was a "large cloth object" hanging from the mirror. Id. at *2. We held that even though the officer was unable "to describe the cloth," that "d[id] not invalidate the stop." Id. at *4. To the contrary, "[b]ecause [the officer] had probable cause to believe that the cloth object violated Code § 46.2-1054, the trial judge did not err in finding that the [officer] had authority to stop the vehicle and to issue a summons." Id.

Acknowledging that he "initially disagreed" with the view taken by these cases, the trial judge explained that "what carrie[d] the day" was the "definition" of obstruction. App. at 105. "[U]ltimately it's the definition that persuaded the Court that that's what the law is intended and that's what the law says." Id. at 105. Repudiating his earlier views, the trial judge held:

> [T]he Court is of the opinion that the standard for [the officer] to have stopped the vehicle was[,] is there *reasonable suspicion* that this object is blocking or cutting off from sight or blocking an unhampered, . . . unrestricted *view of the highway*? Well, *there is reason to believe that it could be*, because there is an object dangling. He is entitled constitutionally to investigate further. So the Court believes that the presence of the object is, in fact, sufficient reasonable suspicion to justify a detention of the vehicle.

Id. (emphasis added).[8] It is the court's holding — not the judge's initial remarks from the bench — that accompanies the final order on appeal to us. Viewed in context, none of the judge's initial remarks can be fairly deemed a "factual finding." *Ante* at 16 n.7.[9] Nor should they be woven into a factual narrative as if they were.

## II.

### A. THE REASONABLE SUSPICION STANDARD

Reasonable suspicion is simply suspicion that is reasonable. It is not something more than suspicion. And it can hardly be called proof. To be sure, the degree of certitude required by reasonable suspicion is "'considerably less than proof of wrongdoing by a preponderance of the evidence,' and 'obviously less demanding than that for probable cause.'" Perry v. Commonwealth, 280 Va. 572, 581, 701 S.E.2d 431, 436 (2010) (quoting United States v. Sokolow, 490 U.S. 1, 7 (1989)); see also Navarette v. California, 134 S. Ct. 1683, 1687 (2014). Consequently, "the mere possibility of an innocent explanation does not necessarily exclude a

---

[8] See also App. at 40-41 (The trial judge confirmed that "the question we have now is [whether there] is reasonable suspicion to believe that there is a traffic infraction taking place[.] So again, is there reasonable suspicion to believe that [the parking pass] is obstructing . . . the driver's *clear view of the highway through the windshield*?" (emphasis added)).

[9] We traditionally decline invitations to "fix upon isolated statements of the trial judge taken out of the full context in which they were made, and use them as a predicate for holding the law has been misapplied." Damon v. York, 54 Va. App. 544, 555, 680 S.E.2d 354, 360 (2009) (internal quotation marks omitted); see also White v. White, 56 Va. App. 214, 217-18, 692 S.E.2d 289, 291 (2010) ("We are particularly skeptical . . . of appellate efforts to piece together . . . fragmented remarks from the bench" in an effort to undermine the court's ultimate holding.).

- 22 -

reasonable suspicion that the suspect might be violating the law." Morris v. City of Va. Beach, 58 Va. App. 173, 183, 707 S.E.2d 479, 483 (2011) (internal quotation marks omitted).

No one can be arrested on the basis of reasonable suspicion. It serves merely to justify a brief detention to investigate. Because the need for justification is quite low, so too is the justifying legal standard. See 4 Wayne R. LaFave, Search & Seizure § 9.5(b), at 658-59 (5th ed. 2012) (noting that reasonable suspicion requires merely "that there exists at the time of the stop a substantial possibility — or, indeed, *even a 'moderate chance'* — that [unlawful] conduct has occurred, is occurring, or is about to occur" (emphasis added) (footnotes omitted) (quoting Safford Unified Sch. Dist. No. 1 v. Redding, 557 U.S. 364, 371 (2009))).

In suppression hearings, a police officer usually takes the stand and describes *what* he saw and, occasionally, *why* he did what he did. While the first part is highly relevant, the second is not. When assessing the legality of an officer's actions, his "subjective motivation is irrelevant." Robinson v. Commonwealth, 273 Va. 26, 37, 639 S.E.2d 217, 223 (2007) (quoting Brigham City v. Stuart, 547 U.S. 398, 404 (2006)). A police officer's "action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively*, justify the action.'" Stuart, 547 U.S. at 404 (brackets omitted) (quoting Scott v. United States, 436 U.S. 128, 138 (1978)); see also Navarette, 134 S. Ct. at 1687. Indeed, settled precedent governing Fourth Amendment cases has "repeatedly rejected a subjective approach." Fernandez v. California, 134 S. Ct. 1126, 1134 (2014) (internal quotation marks omitted).

Put another way, a court should thus make "'an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time,' and not on the officer's actual state of mind at the time the challenged action was taken." Maryland v. Macon, 472 U.S. 463, 470-71 (1985) (quoting Scott, 436 U.S. at 136). Consequently, an "officer's

*subjective characterization* of observed conduct is *not relevant*” to an objective application of the Fourth Amendment.  Jones v. Commonwealth, 279 Va. 665, 673, 691 S.E.2d 801, 805 (2010) (emphasis added and internal quotation marks omitted); see also Stuart, 547 U.S. at 404.[10]

It necessarily follows that, when deciding a suppression motion, a court should *not* limit itself “to what the stopping officer says or to evidence of his subjective rationale,” Raab v. Commonwealth, 50 Va. App. 577, 583 n.2, 652 S.E.2d 144, 148 n.2 (2007) (*en banc*) (quoting United States v. Brown, 232 F.3d 589, 594 (7th Cir. 2000)).[11]  Courts should instead “look to the record as a whole to determine what facts were known to the officer and then consider whether a reasonable officer in those circumstances would have been suspicious.”  LaFave, *supra*, § 9.5(a), at 647 n.22 (quoting United States v. McKie, 951 F.2d 399, 402 (D.C. Cir. 1991)).  Because the reasonable suspicion test “is *purely* objective,” the Terry standard imposes “no requirement that an *actual suspicion* by the officer be shown.”  Id. § 9.5(a), at 647 (second emphasis added).

Citing United States v. Sokolow, 490 U.S. 1 (1989), the majority asserts that an officer making a Terry stop must actually *articulate* the articulable facts that gave rise to *his* personal suspicion.  Sokolow does not stand for that proposition.  Nor do any of the other cases cited by the majority opinion.  Sokolow simply restates that the “totality of the circumstances,” id. at 8 (quoting United States v. Cortez, 449 U.S. 411, 417 (1981)), must give rise to “articulable facts that criminal activity ‘may be afoot,’” id. at 7 (quoting Terry v. Ohio, 392 U.S. 1, 30 (1968)).

---

[10] See also Bond v. United States, 529 U.S. 334, 338 n.2 (2000); Whren v. United States, 517 U.S. 806, 813 (1996); Scott, 436 U.S. at 138; United States v. Johnson, 734 F.3d 270, 275 (4th Cir. 2013); United States v. Singh, 363 F.3d 347, 356 (4th Cir. 2004); United States v. McKie, 951 F.2d 399, 402 (D.C. Cir. 1991); Harris v. Commonwealth, 276 Va. 689, 697, 668 S.E.2d 141, 146 (2008); Robinson, 273 Va. at 37-38, 639 S.E.2d at 223-24.

[11] See also Washington v. Commonwealth, 60 Va. App. 427, 434, 728 S.E.2d 521, 525 (2012); Shifflett v. Commonwealth, 58 Va. App. 732, 736 n.2, 716 S.E.2d 132, 135 n.2 (2011); Morris, 58 Va. App. at 179, 707 S.E.2d at 481; Thomas v. Commonwealth, 57 Va. App. 267, 273-75, 701 S.E.2d 87, 90-91 (2010); Armstead v. Commonwealth, 56 Va. App. 569, 579 n.7, 695 S.E.2d 561, 565 n.7 (2010).

This does not mean that the facts must actually be articulated by the officer on the witness stand or that any such articulation, by itself, must be sufficient to establish reasonable suspicion. The majority's assertion to the contrary is inconsistent with binding *en banc* precedent from our Court, Raab, 50 Va. App. at 583 n.2, 652 S.E.2d at 148 n.2,[12] as well as the uniform view among courts that have addressed this issue.[13]

### B. OBSTRUCTING A DRIVER'S "CLEAR VIEW" OF THE HIGHWAY

As a provision of the Virginia Motor Vehicle Code, Code § 46.2-1054 prohibits, among other things, any object from being "suspended from any part of the motor vehicle in such a manner as to obstruct the driver's clear view of the highway through the windshield, the front side windows, or the rear window." This portion of the statute has three components: (i) something "suspended," (ii) that serves to "obstruct" a "clear view" of the highway, (iii) through any window of the vehicle (except for the rear side windows). Id.

By statute, a highway includes "the *entire width between the boundary lines* of every way or place open to the use of the public for purposes of vehicular travel in the Commonwealth, including the streets and alleys." Code § 46.2-100 (emphasis added). A highway is not — as Mason presumes — simply the stretch of pavement immediately in front of a driver's vehicle. Under Virginia law, a "highway" is not limited "to a hard-surfaced or partly hard-surfaced way

---

[12] The "interpanel accord doctrine" precludes a panel of our Court from altering the holding of a prior panel, Startin v. Commonwealth, 56 Va. App. 26, 39 n.3, 690 S.E.2d 310, 316 n.3 (2010) (*en banc*) (citing Atkins v. Commonwealth, 54 Va. App. 340, 343 n.2, 678 S.E.2d 834, 835 n.2 (2009)), aff'd, 281 Va. 374, 706 S.E.2d 873 (2011). All the more, the doctrine precludes a panel from expressly or implicitly repudiating a prior *en banc* holding.

[13] See, e.g., United States v. Bailey, 622 F.3d 1, 5-6 (D.C. Cir. 2010); Brown, 232 F.3d at 594; United States v. Ozbirn, 189 F.3d 1194, 1198-99 (10th Cir. 1999); United States v. Swann, 149 F.3d 271, 272 (4th Cir. 1998); United States v. Jones, 990 F.2d 405, 408 (8th Cir. 1993); McKie, 951 F.2d at 402; United States v. Hawkins, 811 F.2d 210, 213 (3d Cir. 1987); State v. Heminover, 619 N.W.2d 353, 357 (Iowa 2000), abrogated on other grounds by State v. Turner, 630 N.W.2d 601, 606 n.2 (Iowa 2001); Zimmerman v. N.D. Dep't of Transp. Dir., 543 N.W.2d 479, 483 (N.D. 1996).

or to a dirt and gravel way.  It does not confine a highway to the main-travelled portion of the way or to lanes specifically designated for vehicular traffic."  Crouse v. Pugh, 188 Va. 156, 164-65, 49 S.E.2d 421, 426 (1948); see also Jessee v. Slate, 196 Va. 1074, 1083, 86 S.E.2d 821, 826 (1955).

Because a "highway" includes the "entire width of the boundary lines" of the "way or place" used by vehicular traffic, Code § 46.2-100, it includes overhead highway signs,[14] on-ramps and off-ramps, merge lanes, deceleration lanes, roadways,[15] bridges,[16] intersections,[17] shoulders,[18] pedestrian crosswalks,[19] and shared-use paths.[20]  Thus, a "clear view" of a "highway," as used in Code § 46.2-1054, no doubt means the pavement itself and everything physically on it.  It would make no sense for Code § 46.2-1054 to prohibit a dangling object from

---

[14] See Code § 46.2-100 (defining a "traffic control device" as "a sign, signal, marking, or other device used to regulate, warn, or guide traffic placed on, over, or adjacent to a . . . highway").

[15] A "roadway," narrower in scope than a highway yet still broad in terms of the surface area it includes, is defined as "that portion of a highway improved, designed, or ordinarily used for vehicular travel, exclusive of the shoulder."  Code § 46.2-100.  A highway may itself "include two or more roadways."  Id.

[16] See Nelson v. Cnty. of Henrico, 10 Va. App. 558, 561, 393 S.E.2d 644, 646 (1990).

[17] See Code § 46.2-100 (defining "intersection" as certain areas of highways that "join one another," cross an "intersecting highway," or are crossed "by a pedestrian crosswalk").

[18] A "shoulder" is defined as "that *part of a highway* between the portion regularly traveled by vehicular traffic and the lateral curbline or ditch."  Code § 46.2-100 (emphasis added); see also Jessee, 196 Va. at 1083, 86 S.E.2d at 826.

[19] See Code § 46.2-100 (defining "crosswalk" as a "part of a roadway"); see also *supra* note 17 (defining "intersection").

[20] "Shared-use paths" include bikeways and other paths that are open to "pedestrians, skaters, users of wheel chairs or wheel chair conveyances, joggers, and other nonmotorized users."  Code § 46.2-100.

obstructing a driver's view of the pavement directly in front him but not a vehicle, bicyclist, or pedestrian[21] moving across that same pavement.

In this case, Officer Richards testified that he "clearly" observed the parking pass prior to stopping the vehicle. App. at 31. The parking pass is an exhibit. We need no description of it from the officer. We are looking at the very thing that the officer said he clearly saw: an opaque plastic card that is five inches long and three inches wide. And the trial judge had something even better. He took a "view of the scene" to determine if the parking pass could obstruct a driver's vision in a vehicle similar to the one that the officer had stopped. Id. at 101; see Oral Argument Audio at 9:47 to 9:55, 26:04 to 26:30.

Given these facts, a reasonable officer could suspect that the opaque, five-by-three-inch parking pass dangling from a rearview mirror might violate Code § 46.2-1054 and thus warrant an investigatory stop to find out if it in fact did. Several scenarios show why. The bottom of the parking pass would be at or slightly above eye level for a driver of average height. The parking pass could be at an angle that might partially block a driver's clear view of a vehicle ahead and to the right of him. If that vehicle put on its left-turn signal, for example, the driver with the parking pass might not see it at all — particularly when the vehicle is merging into highway traffic from an on-ramp. If a driver simply wanted to make a right turn at an intersection, the parking pass could partially obscure his field of vision. An enhanced risk would exist when the driving occurs at night and only the rear running lights of a vehicle ahead and to the right are visible. Consider, too, highway signs that are often placed overhead and on the right shoulder of

---

[21] Crouse, 188 Va. at 165, 49 S.E.2d at 426 ("The Motor Vehicle Code of Virginia recognizes the right of both the pedestrian and motorist to use the highways for travel.").

the highway.[22] A person of any height could have his clear view of highway signs partially obstructed by the parking pass especially, once again, during nighttime driving.

Under settled law, an officer need not have proof beyond a reasonable doubt of any of these scenarios before he makes a vehicular stop. Nor does he need to be convinced by a preponderance of the evidence. To be sure, the quantum of confidence need not even rise to the level of probable cause. See Perry, 280 Va. at 581, 701 S.E.2d at 436. He need only have a reasonable suspicion of a violation of Code § 46.2-1054, which merely requires that he be aware of articulable facts suggesting that the parking pass could be non-compliant with the statute.

Though it was legally unnecessary for Officer Richards to testify that he *subjectively* believed the parking pass could have obscured the driver's clear view of the highway, Raab, 50 Va. App. at 583 n.2, 652 S.E.2d at 148 n.2, he did in fact come to this conclusion. Within seconds of stating that he "clearly" saw the parking pass, Officer Richards testified that he believed that it "could obstruct a driver's view." App. at 31. In context, he was speaking of the driver's view of the highway — not something other than the highway.

## III.

The trial court correctly held that a reasonable officer could make an investigatory stop of the vehicle to determine if, in fact, the parking pass violated Code § 46.2-1054.

I respectfully dissent.

---

[22] See *supra* note 14.